# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA          CRIMINAL ACTION

VERSUS          NO. 04-17

JOHN JOHNSON          SECTION "C"

## ORDER AND REASONS

This capital matter comes before the Court on motion for new trial and supplemental motion for new trial filed by the defendant, John Johnson ("Johnson"). Oral argument was held on March 23, 2010. Having considered the record, the memoranda and argument of counsel and the law, the Court affirms the convictions but grants a new penalty phase hearing for the reasons set forth below.

In May 2009, the defendant was convicted of three counts of a Second Superseding Indictment pertaining to his role in a 2004 attempted bank robbery and death of a bank security officer, Orleans Parish Criminal Deputy Sheriff Sidney Zaffuto. The jury imposed the death penalty on the two capital counts, Count Two and Count Three, making the same eligibility phase findings as to each count, and also making the same selection phase findings as to non-statutory aggravating factors and mitigating factors.

Trial errors and the resulting fairness of the trial are evaluated "against the record as a whole" on a motion for new trial. *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004). Johnson's guilt as to all three counts was essentially conceded, although issues concerning his intent were disputed by the defense. His willingness to plead guilty to a life sentence from the inception of the prosecution was also stipulated. The entire attempted robbery and murder were captured on surveillance film introduced into evidence. During the aborted robbery, defendant Johnson and co-defendant Joseph Smith ("Smith") were shot by another bank security guard,

1

Orleans Parish Deputy Andrew Jenkins. All three defendants were captured shortly after fleeing the bank. Many of the underlying facts were stipulated. Rec. Doc. 1240. The guilt phase verdict was returned in a little over one hour. Rec. Doc. 1219.

The attempted robbery and murder at the bank occurred over a very short period of time, shocking in its brevity.[1] The surveillance photos and testimony are gripping and the crimes traumatized all unfortunate enough to have been in that bank at that time. The surveillance and testimony establishes that Smith entered first, co-defendant Herbert Jones ("Jones) entered next and Johnson was the last to enter, taking at most perhaps six steps into the bank and remaining near the front door. Smith rushed toward Deputy Zaffuto, who was standing at a check writing stand near the door, pointed his gun at him, disarmed him and slid the deputy's service gun to Johnson. While this was happening, Jones quickly moved in the opposite direction toward the bank manager's office. Deputy Jenkins, who had been in corner by the entrance to the bank, out of the sight of the defendants, testified that he ordered Smith to drop his gun and when Smith failed to do so, Jenkins shot him, and then likewise shot Johnson, hitting both in the leg area.[2] Meanwhile, after Smith was shot, Deputy Zaffuto retrieved Smith's gun and attempted to shoot several times at Johnson from behind the podium but the gun would not fire. Johnson shot back several times at Deputy Zaffuto and also at Deputy Jenkins. Moments thereafter, Smith scrambled across the floor to the entrance of the bank and both he and Johnson fled, to be arrested shortly thereafter.

---

[1] The longest estimate came from FBI Special Agent Tim Denny ("Denny"), who testified that approximately 90 seconds elapsed between the time co-defendant Smith first stepped over the threshold and the time he crawled out of the bank. Rec. Doc. 1271, pp. 248-249. The Court's estimate was less than 60 seconds from beginning to end, but the sequential surveillance photos are the best evidence and are available for review. Exhs. 11- 11D.

[2] Deputy Jenkins testified that he turned his attention first to Smith, shooting him in the leg area with two or three shots, then turned to Johnson and also shot him in the leg area. Deputy Jenkins estimated that he emptied all six bullets from his gun within 25 to 30 seconds, at which time he attempted to hide from view of Johnson, who was the only defendant shooting. Rec. Doc. 1251, pp. 16-20.

The bullet fired by Johnson that killed Deputy Zaffuto is captured midair in the surveillance photos at a time when Zaffuto was trying to shoot Johnson with Smith's inoperable gun, not knowing that the gun did not shoot. The fatal bullet first hit the grip of the gun in Zaffuto's hand, then ricocheted into his chest, killing him. Johnson also shot Deputy Jenkins in the foot with Deputy Zaffuto's service revolver just before crawling out of the building immediately before Smith. Johnson had what appears to be ample opportunity to leave the building immediately after Jones, which would have left Smith several yards away from the door and in Deputy Jenkins' line of fire.

The eligibility phase of trial of the sentencing hearing was short in duration and the jury deliberated for less than an hour. Rec. Doc. 1221.[3] The jury found the gateway factors that Johnson, who was nearly 57 years old at trial, was over eighteen years old at the time of the offense, and that he intentionally killed Sidney Zaffuto. 18 U.S.C. § 3591; Rec. Docs. 1221-1, 1221-2. It also found, as statutory aggravating factors that the defendant had been previously imprisoned for a crime that involved the use of a firearm against another person, that the defendant knowingly created a grave risk of death to more than one person in addition to the victim, and that he attempted to kill more than one person in a single criminal episode. 18 U.S.C. § 3592; Rec. Docs. 1221-1, 1221-2.

The unanimous jury verdicts from the selection phase of trial consisted of several findings. The jury concluded that the government had proven, beyond a reasonable doubt, the non-statutory aggravating factors that Johnson aided and abetted the taking of a hostage during the robbery, that the defendant had a substantial criminal history based on stipulated guilty

---

[3]As already noted, the defense only disputed the level of intent. It did not dispute the remainder of the statutory aggravators.

pleas[4], and an additional unadjudicated attempted bank robbery in 2003.[5]   In addition, the jury unanimously found that the murder of Sidney Zaffuto created harmful emotional and financial distress on his family.  Rec. Docs. 1238-1, 1238-2.

At the same time, all the jurors found non-statutory mitigating factors that the defendant offered to plead guilty to a life sentence at the inception of the prosecution, that he was raised in poverty by his mother, that he lacked a positive male role model and father figure, that he was 57 years old, and that if he was not sentenced to death, he will be sentenced to a term of life imprisonment without the opportunity for release.  *Id.*   One juror found an additional non-statutory mitigating factor in that Johnson became addicted to heroin in his youth, struggled throughout his life to stop using drugs, being gainfully employed when he was off drugs but relapsing back to drugs and crime to support his addiction.  *Id.*   One juror also found that Johnson's life had value in that he had been a good and loving son, brother, father and grandfather and that his family will suffer greatly if he is executed.  *Id.*   Some evidence was presented that Johnson had in fact shot heroin the morning of the crime, the crime occurring midday.


**CAPITAL REVIEW UNDER RULE 33**[6]

---

[4]The three stipulated convictions based on guilty pleas were a conviction for simple burglary in 1974, a conviction for illegal carrying of a firearm by a felon in 1977, and a conviction for bank robbery in 1983.

[5]Co-defendant Jones died of natural causes prior to trial.  He testified by deposition, as a government witness,  that he participated in the 2003 attempted bank robbery with Johnson. He also testified that, in 1974,  he planned a robbery of the Ruiz Restaurant in New Orleans but did not participate in it.  The government contended that Johnson did participate and shot and killed the restaurant owner, Joseph Gennaro.   The jury, however, did not unanimously find Johnson to have committed that offense.

[6]Rule 33 provided in relevant part as follows:
   (a) Defendants Motion.  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. ...
   (b) Time to File.
   (1) Newly Discovered Evidence.  Any motion for a new trial grounded on newly

Defendant Johnson has moved for a new trial based on eighteen claims in two motions. In order to frame his allegations, the Court begins with a restatement of some fundamental legal principles with respect to review of capital cases as well as the standards for a motion for new trial under Fed. R. Crim. P. 33.

The United States Supreme Court has consistently held that under the Eighth Amendment "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *Caldwell v. Mississippi*, 472 U.S. 320, 329, 105 S.Ct. 2633 (1985)(citation omitted); *Eddings v. Oklahoma*, 455 U.S. 104, 118, 102 S.Ct. 869(1982)(O'CONNOR, J., concurring) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake"); see also *Reid v. Covert*, 354 U.S. 1, 45-46, 77 S.Ct. 1222 (1957)(J. Frankfurter concurrence)("The taking of life is irrevocable. It is in capital cases especially that the balance of conflicting interests must be weighed most heavily in favor of the procedural safeguards of the Bill of Rights."); *Andres v. U.S.*, 333 U.S. 740, 752, 68 S.Ct. 880 (1948)("In death cases doubts such as those presented here [which involved a confusing jury instruction] should be resolved in favor of the accused.").

 In addition to demanding meticulous review of procedural safeguards in capital verdicts, the Supreme Court more recently has indicated that capital punishment in general should be a relatively rare occurrence.  "It is an established principle that decency, in its essence, presumes respect for the individual and thus moderation or restraint in the application of capital punishment." *Kennedy v. Louisiana*, __ U.S., 128 S.Ct. 2641, 2658, *modified on denial of reh'g on other grounds*, ___ U.S. ___, 129 S.Ct. 1 (2008).  In capital jurisprudence, "[t]he tension

discovered evidence must be filed within 3 years after the verdict or finding of guilty. ...
 (2) Other Grounds.  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.

between general rules and case-specific circumstances has produced results not all together satisfactory." *Id.* at 2659. The Supreme Court's response to capital case law, "which is still in search of a unifying principle, has been to insist upon confining the instances in which capital punishment may be imposed. ... because 'death as a punishment is unique in its severity and irrevocability.'" *Id.* at 2660, (quoting *Gregg v. Georgia*, 428 U.S. 153, 187 (1976).

Against this backdrop, a motion for new trial in a capital case is governed by the same Rule 33 applicable in all criminal cases. In general, a district court may grant a new trial under Rule 33 "if the interest of justice so requires" whether based on newly discovered evidence or other grounds. *Wall*, 389 F.3d at 466. The motion is addressed to the discretion of the district court, "which should be exercised with caution, and the power to grant a new trial ... should be invoked only in exceptional cases." *United States v. Robertson*, 110 F.3d 1113, 1120 n. 11 (5th Cir. 1997). See also *United States v. Scroggins,* 379 F.3d 233, 239 (5th Cir. 2004), *vacated on other grounds*, 543 U.S. 1112 (2005).

The Court has found that federal cases reviewing contemporary capital issues under Rule 33 are scarce, so non-capital jurisprudence has been sought for guidance. In general, the interest of justice standard under Rule 33 "requires the district court to balance the alleged errors against the record as a whole and evaluate the fairness of trial." *Wall*, 389 F.3d at 466, quoting *United States. v. McBride*, 862 F.2d 1316, 1319 (8th Cir. 1988). The grant of a new trial in the interest of justice may be based on the trial court's evaluation of witnesses and weighing of evidence. *Wall,* 389 F.3d at 465-466, *O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997). But the district court should not set aside the verdict "simply because [the court] feels some other result would be more reasonable." *United States v. Munoz*, 150 F.3d 401, 413 (5th Cir. 1998). Deference is given to the district court, however, because it actually observed the demeanor of witnesses and their impact on the jury. *Wall*, 389 F.3d at 465; *O'Keefe*, 128 F.2d at 893.

The trial court should not grant a motion for new trial "unless there would be a

miscarriage of justice or the weight of evidence preponderates against the verdict." *Wall*, 389

F.3d at 466, citing *O'Keefe*, 128 F.3d at 898.   A new trial should be granted "only upon a

demonstration of adverse effects on substantial rights of a defendant."  *Wall*, 389 F.3d at 466;

*Scroggins*, 379 F.3d at 256*; United States v. Cooks*, 52 F.3d 101, 103 (5th Cir. 1995);  *Rasco*, 123

 F.3d at 228.

     The district court should consider the harmless and plain provisions of Rule 52,[7]  and

deny a motion for new trial if substantial rights of the defendant were not affected by trial error.[8]

Charles Alan Wright, Nancy J. King & Susan R. Klein, *Federal Practice & Procedure: Criminal

3d*  § 551 (West 2004).  "The requirement of Rule 51 that objections must have been made at the

trial court level and the doctrines of harmless and plain error as stated in Rule 52 apply to Rule

33 motions."  Charles. A. Moore, 8A *Moore's Federal Practice* § 633.21[1].   Generally, the

harmless error rule is appropriate in evaluating motions for new trial; that rule presumes the

existence of error.  See, e.g., *United States v. Logan* 861 F.2d 859, 864 (5th Cir. 1988).

     Other authority, however, stands for the proposition that the district court is not

constrained by the plain error provisions of Rule 52, in light of its broad discretion on a motion

for new trial, which may be granted under the  "cumulative error doctrine." *United States v.*

---

[7] Rule 52 provides:
  (a) Harmless Error.  Any error, defect, irregularity, or variance that does not affect
substantial rights must be disregarded.
  (b) Plain Error.  A plain error that affects substantial rights may be considered even
though it was not brought to the court's attention.

[8] For appellate purposes, plain error review of non-structural error requires (1) an error or
deviation from a legal rule that has not been affirmatively waived, (2) that is clear or obvious
rather than subject to reasonable dispute, (3) that must affect the appellant's substantial rights,
which ordinarily means that it affected the outcome of the judicial proceedings, and (4) that
seriously affects the fairness, integrity or public reputation of judicial proceedings. *United States
v. Olano*, 507 U.S. 75, 732-736 (1993).  See also  *Puckett v. United States*, ___ U.S. ___, 129
S.Ct. 1423, 1429 (2009);  *Johnson v. United States*, 520 U.S. 461, 466-467 (1997).   "Affecting
substantial rights" in most cases means prejudicial, and the defendant bears burden under 52(b)
to show error was prejudicial; normally the defendant should make a specific showing of
prejudice, although there may be a special category of forfeited errors that can be corrected
regardless of their effect on the outcome.  *Olano*, 507 U.S. at 735.

*Williams,* 264 F.3d 561, 572 (5th Cir. 2001). *Munoz,* 150 F.3d at 418.   The Fifth Circuit has held, for example, that "[a] miscarriage of justice warranting a new trial in certain circumstances may occur even when there has been no specific legal error."  *Scroggins,* 370 F.3d at 239, 255.  See also *United States v. Sardesai,* 125 F.3d 850 (4th Cir. 1997); *United States v. Aderoju,* 2006 WL 2222368 *5, n. 5 (E.D.Va. 1006); *United States v. Jennings,* 438 F.Supp.2d 637, 641 (E.D.Va. 2006).

In general, the burden is on the defendant on a motion for new trial, "although the extent of that burden may vary depending on the ground on which the new trial is being sought." Charles Alan Wright, Nancy J. King & Susan R. Klein, *Federal Practice & Procedure: Criminal 3d* § 551 (West 2004).   When a court of appeals  reviews a district court decision on a motion for new trial "to some extent it must begin with the error or grounds upon which the district court based its decision and then proceed to examine the court's decision as measured against the relevant standard."  *Wall,* 389 F.3d at 466.   "Otherwise, it would be impossible to give any meaning to the concept of 'miscarriage of justice."  *Id.*   Also, more than just "the Judge's feeling" that a miscarriage has occurred is required.  *Id.*

The Court also finds helpful Judge Henry Friendly's observations, dealing with a §2255 motion to vacate sentence, regarding the balancing of the gravity of the trial error against its prejudicial effect:

> The conclusion we draw from all this is that the standard of how serious the probable effect of an act or omission at a criminal trial must be in order to obtain the reversal or, where other requirements are met, the vacating of a sentence, is in some degree a function of the gravity of the act or omission; the strictness of the application of the harmless error standard seems somewhat to vary, and its reciprocal, the required showing of prejudice, to vary inversely, with the degree to which the conduct of the trial has violated basic concepts of fair play. At one end of the range is the case where the defendant has simply, although excusably, not had the benefit of evidence that has later become available to him; there the *Berry* test requires a showing that the new evidence 'would probably produce a different verdict.' At the other end of the range is the case of a defendant being obliged to plead to a capital charge without benefit of counsel; there the court 'does not stop to inquire whether prejudice resulted.' *Hamilton v. State of Alabama,* 28 S.Ct. 157, 159 (1961). ... Between these extremes lie the other cases we have reviewed-newly discovered evidence that a witness has recanted, or had lied

(without knowledge by the prosecutor); ordinary errors in the admission or exclusion of evidence; violations of statutory commands; and infringements of other constitutional guarantees.

        The reason why the showing of prejudice required to bring down the balance in favor of a new trial will vary from case to case is that the pans contain weights and counterweights other than the interest in a perfect trial. Sometimes only a small showing of prejudice, or none, is demanded because that interest is reinforced by the necessity that 'The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach,' *People v. Savvides*, *supra*, and by the teaching of experience that mere admonitions are insufficient to prevent repetition of abuse. See *Mapp v. Ohio*, 367 U.S. 643, 650-653, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In other cases, where the conduct of the trial has been less censurable, or not censurable at all, a greater showing of prejudice is demanded, because the interest in obtaining an ideal trial, with the trier of the facts considering all admissible evidence that has ever become available, and nothing else, is not thus supplemented and may be outweighed by the interest in avoiding a retrial unlikely to have a different outcome- an interest especially weighty when, as is normally true on collateral attack, the second trial will come long after the first.

*Kyle v. United States*, 297 F.2d 507, 514-515 (2nd Cir. 1961)(J. Friendly)(footnote omitted).

        The Court concludes that prosecutorial error requires a new trial as to the selection phase in the interest of justice.[9]  Also, the Court takes the opportunity under Rule 33 for self-correction, and in so doing admits that the Court itself made errors in some of the trial rulings in the selection phase that have been challenged in these motions.

        The Court will address the defendant's eighteen claims in the two motions for new trial in an order other than that in which the defendant has presented them by dividing the claims into five categories, based on the Court's findings.   Category I are claims that challenge the underlying convictions, Category II are claims with no error or with waiver, Category III are claims with error that do not support a new trial individually, Category IV are claims with error that individually warrant a new trial, and Category V are errors in Category III and Category IV that cumulatively support a new trial in the interest of justice.   The claims will be presented in this altered order of reverse significance.

---

[9]At the same time, the Court finds it unnecessary to determine if the prosecutorial errors were in  bad faith. If at a later time that finding needs to be made, it will be addressed separately.

**CATEGORY I: CONVICTIONS: Claim XV and Supplemental Motion**

Claim XV: Double Jeopardy

The defendant challenges the imposition of separate death verdicts on Count Two[10], which alleged violation of 18 U.S.C. § 2113(a)[11], 18 U.S.C. § 2113(e)[12] and 18 U.S.C. § 2, and Count Three[13], which set forth a violation of 18 U.S.C. §924(c)(1),[14] 18 U.S.C. § 924(j)[15] and 18

---

[10]Count Two reads in full as follows:

That on or about January 8, 2004, in the Eastern District of Louisiana, the defendants, **JOHN JOHNSON, HERBERT JONES, JR.,** and **JOSEPH SMITH,** aiding and abetting each other, did by force, violence, and intimidation did take and attempt to take from the person and presence of another, money, in the form of United States currency, and other things of value, belonging to and in the care, custody, control, management and possession of IBERIABANK, 4826 General DeGaulle Drive, New Orleans, Louisiana, a bank whose deposits were then and there insured by the Federal Deposit Insurance Corporation (FDIC), and in committing this offense and avoiding and attempting to avoid apprehension for the commission of this offense killed and caused the death of an individual, that is, Sidney Zaffuto, an Orleans Parish Criminal Deputy Sheriff; all in violation of Title 18, United States Code, Section 2113(a) and 2113(e) and Title 18, United States Code, Section 2.

[11]Section 2113(a) provides: "Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, ...any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank ... [s]hall be fined under this title or imprisoned not more than twenty years, or both."

[12]Section 2113(e) provides for capital punishment: "Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense ...kills any person, ... shall be punished by death or life imprisonment."

[13]Count Three reads in full as follows:

That on or about January 8, 2004, in the Eastern District of Louisiana, the defendants, **JOHN JOHNSON, HERBERT JONES, JR.,** and **JOSEPH SMITH,** aiding and abetting each other, knowingly used and carried a firearm, more specifically, a .45 ACP caliber semiautomatic pistol during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the perpetration and attempted perpetration of bank robbery as charged in Count Two of this superseding indictment and which is realleged and incorporated herein by reference, and in the course thereof caused the death of Sidney Zaffuto, which death constituted a murder as defined in 18 U.S.C. Section 1111, in that the defendants caused the death unlawfully, willfully, deliberately, maliciously, with premeditation and malice aforethought, and in the

U.S.C. § 2.  Rec. Docs. 157; 1219-3; 1238-1; 1238-2.   The defendant argues that these two

counts "aris[e] from the same offense" in violation of the Double Jeopardy Clause of the Fifth

Amendment.[16]

Specifically, the defense claims that the factual allegations of the two capital counts are

entirely duplicative for purposes of *United States v. Agofsky*, 458 F.3d 369 (5th Cir. 2006), and

that the special findings of the two counts are the same.[17]   In addition, the defense argues that

the imposition of two penalties for a single violation of 18 U.S.C. § 924(c) and 18 U.S.C. §

2113(d) is a double jeopardy violation according to *Simpson v. United States* 435 U.S. 6, 16

(1978), that survived subsequent amendments to Section 924( c) in 1984.

The prosecution opposes this claim with the argument that Fifth Circuit jurisprudence

recognizes Congress's clear legislative intent that multiple convictions and punishments are

---

perpetration and attempted perpetration of robbery, all in violation of Title 18, United States Code, Sections 924(c)(1)(A) and (i)(1) and Title 18, United States Code, Section 2.

[14]Section 924(c)(1)(A) provides: "Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence ... for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence ... [be sentenced to a minimum term of imprisonment]."

[15]Section 924(j) provides for capital punishment: "A person who, in the course of a violation of section (c ), causes the death of a person through  the use of a firearm, shall — (1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life."

[16]The defendant also argues that "there was clearly a multiplicity with respect to the first three counts of the indictment."  Rec. Doc. 1337, p. 69.   Count One charged the defendant with conspiracy under 18 U.S.C. § 371 relative to the bank robbery and death set forth in Count Two. Johnson was found guilty on Count One.  It is unclear whether the defendant's challenge extends to this non-capital count but, in any event, the Court finds that claim lacks merit in light of the rule that a substantive crime and conspiracy to commit the substantive crime are not the same offense for double jeopardy purposes.  *United States v. Felix*, 503 U.S. 378, 389 (1992).

[17]The defense refers to the "special findings of the grand jury verdict" with respect to the two counts, which the Court will assume refers to the Selection Phase Special Verdict Form as to the two counts.  Rec. Docs. 1337, p. 69, 1238-1, 1238-2.

allowed for a single criminal episode under the two sections at issue here, 18 U.S.C. § 924 and 18 U.S.C. § 2113. It relies on caselaw including *United States v. Holloway*, 905 F.2d 893, 895 (5th Cir. 1990), *United States v. Portillo*, 18 F.3d 290, 291 (5th Cir. 1994) and *United States v Singleton*, 16 F.3d 1419, 1428 (5th Cir. 1994).

The Court finds that the defense argument on this claim is unpersuasive. First, part of Congress's intent in enacting the 1984 Comprehensive Crime Control Act and amendments to 18 U.S.C. § 924( c) was to overrule *Simpson;* the revised Section 924(c ) "serve[s] as a cumulative punishment in addition to that provided for the underlying violent crime." *Holloway,* 905 F.2d at 894. The revised section specifically provides for punishment thereunder "in addition to the punishment provided for such crime of violence ..." Also, none of the subject statutes contain the challenged "jurisdictional element" at issue in *Agofsky,* 458 F.3d at 372.

Instead, for double jeopardy purposes, the elements and relevant facts of the two crimes charged differ from each other for purposes of *Blockburger v. United States*, 284 U.S. 299 (1932). See *United States v. Allen*, 247 F.3d 741, 767 (8th Cir. 2001), *vacated on other grounds*, 536 U.S. 953 (2002). Where, as here, the alleged double jeopardy violation is not based on multiple trials for a single offense, but rather cumulative sentences imposed in a single trial, the Double Jeopardy Clause "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 368 (1983). The Court finds that the legislative intent and sentencing language of the relevant statutes here is clear, and that no double jeopardy violation has occurred. See also *United States v. Allen*, 247 F.3d at 767 (Sections 2113(a) & (e) and Sections 924(c)(1) and (j)(1)); *United States v. McCarty*, 35 F.3d 1349,1361 (5th Cir. 1994)(Section 924(c)(1) and Sections 2113(a) and (d)). The Court finds this claim to lack merit, as the Court finds no error.

Supplemental Motion For New Trial And To Set Aside Count III Of The Indictment And Verdicts  Based Upon Emerging Authority

The defendant argues in supplemental motion for new trial that the conviction in Count Three should be set aside because 18 U.S.C. § 924(c ) "does not provide a separate count or criminal charge but rather designates an alternative minimum punishment for conduct otherwise criminalized."  Rec. Doc. 1448, p. 3.   In so doing, the defendant acknowledges Fifth Circuit authority to the contrary, including *United States v. Gould*, 329 Fed.Appx. 569 (5th Cir. 2009), *cert. granted,* ___ U.S. ___, 130 S.Ct. 1283 (2010).   The Court notes that the inclusion of the capital language in 18 U.S.C. § 924(j) bolsters the Fifth Circuit precedent on this issue by limiting its application to "[a] person who, in the course of a violation of section (c ) ..."   If Section 924 (c ) was a penalty provision only, the prefatory clause in Section 924(j) would be illogical; instead, it depends on the establishment of a separate offense in Section 924(c ).   Waiting further direction from the United States Supreme Court on the issue, this claim is denied.   The Court finds no error.

The remaining claims in these two motions pertain to the death penalty, not the finding of guilt.   To the extent that it is necessary, however, the Court specifically finds no reason for a new trial on the underlying convictions of guilty on any of the three counts.


**CATEGORY II: NO ERROR/WAIVER: Claims IV, V, VI, VII, VIII, XI, XII, XIV &  XVI**

Claim IV:   The Government's Repeated Suggestion That Mr. Johnson Should Be A Man And Admit His Role In The Offense, While Simultaneously Succeeding In Excluding Documentary Evidence That Mr. Johnson Expressed Remorse And Accepted Moral Responsibility Undermine The Validity Of The Sentence And Violates Due Process

This is the first claim made by the defense focused on the testimony of Robert Goodman ("Goodman") and the allegation that Johnson committed murder in a 1974 botched restaurant robbery, for which there was no prosecution.  This 1974 murder of Joseph Gennaro at Ruiz Restaurant in Jefferson Parish was included as a part of the non-statutory aggravating factor of "substantial criminal history."  In March 2009, the government gave notice of the anticipated

testimony of Goodman, who allegedly had participated in the same 1974 event and whose DNA was found on evidence left near the scene in 1974.

Goodman testified during the selection phase of trial for the government and was the only eyewitness who asserted that Johnson in fact shot Joseph Gennaro.[18]  On cross-examination, Goodman stated that defendant Johnson did in fact shoot Gennaro, and that "if he was big enough a man, he would say the things his own self rather than me sitting here to say it for him." Rec. Doc. 1252, p. 55.   This remark was elicited by defense counsel, and while it was not entirely responsive to the question,  it was not entirely unresponsive either.[19]   The defense argues that this was an improper comment on Johnson's right not to testify, but the Court has been unable to find case law in which *witness* comment on a failure to testify constitutes error. Also,  Goodman testified in the government's case in the selection phase, before the defense had begun its selection phase case and at a time when it was unknown whether Johnson would testify or not. In fact, defense counsel had stated in opening remarks that Johnson would testify.   Rec. Doc. 1272, pp. 83-84.

More problematic is the fact that in closing argument, after defendant Johnson had not in fact testified, both prosecutors referred to Goodman's testimony.

> And on cross-examination he [Goodman] called the defendant out, saying he should be a man and step up and tell people he shot the guy.

Rec. Doc. 1273, p. 16.

> Again, a refusal to take responsibility for his actions, as Robert Goodman reminded him he should be doing.

---

[18]Co-defendant, Herbert Jones, testified for the government that he planned the robbery but did not participate.  He also testified that afterwards, Johnson told him he had shot the owner. Exh. P4A,  pp. 57-64.

[19]Defense counsel was pressing Goodman to acknowledge he believed Johnson was responsible for Goodman's recent arrest on the 1974 charge, implying that Goodman was now saying Johnson was the shooter, out of resentment and also to cut a deal with the government.

*Id.* at p. 56.

A prosecutor is prohibited from commenting, directly or indirectly, on the failure of a defendant to testify. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229 (1965); *United States v. Wharton*, 320 F.3d 526 (5th Cir. 2003). Both of these remarks in closing arguments constituted a comment on Johnson's failure to testify, and admit responsibility for the 1974 slaying. Nevertheless, as the government noted, no objection was lodged to either portions of the closing argument.

The Court concludes the comments did not affect any substantial right of the defendant for purposes of review under Rule 52(b). First of all, the comments were brief and in passing. Secondly, the Court instructed the jury at the close of the penalty phase, in connection with both the 1974 alleged murder and another unadjudicated attempted bank robbery, that the defendant had no obligation to prove his innocence and no inference could be drawn from his failure to testify. Rec. Doc. 1273, pp. 75-76. Finally, according to the selection phase verdicts on Count Two and Count Three, the jury did not unanimously conclude Johnson was in fact guilty of the 1974 slaying, so for at least one or more jurors, Johnson had nothing to confess. Rec. Docs. 1238-1, 1238-2.

Defendant Johnson also argues that these impermissible comments were particularly prejudicial because the defense had been precluded by the Court from introducing a videotaped statement of Johnson, expressing his remorse and acceptance of responsibility.[20] However, that video concerned the Zaffuto killing, not the 1974 slaying. The defense, on Johnson's behalf, steadfastly denied his guilt in the 1974 slaying. Also, the defense inexplicably claims that the video was not hearsay because it was not being offered to establish the truth of his contents. It certainly was, as presumably the whole purpose of introducing it would have been to convince

---

[20]As a point of clarification, prior to trial the Court held that Johnson would have to take the stand and be subject to cross-examination before the video statement could be introduced. If he did so, then the video would have been admissible. Rec. Doc. 1066.

the jury that Johnson was sincerely remorseful for the Iberia Bank crimes and not just feigning regret.  Finally, the prosecution and defense stipulated that as of January 2004, Johnson had been willing to plead guilty to a life sentence without the possibility of release.   Rec. Doc. 1240, #12. The defense did list as a mitigating factor Johnson's willingness to plead guilty to a life sentence, which is what the video concerned, and all twelve jurors made that finding.   Rec. Doc. 1238-1, 1238-2.   See *United States v. Fell*, 531 F.3d 197, 220 (2nd Cir. 2008).

The Court finds no error.


Claim V:   The Failure Of The Government To Disclose Evidence That Impeached Shirley Zaffuto's Claim Concerning Financial Harm Requires Reversal Of The Sentence

In this claim, defendant Johnson argued that the prosecution withheld significant information relevant to the financial aspect of the victim impact aggravating factor.    For the reasons stated in its ruling denying discovery on this issue, the Court find no error.   See Rec. Doc. 1476.


Claim VI: Misrepresentations Concerning the Communications Between the Government and Its Key Penalty Phase Witness Undermine Confidence in the Outcome

In this claim, defendant Johnson contends that the government provided false information regarding the number of times it met with Goodman, his lawyer or associates, and the nature of the discussions, that ultimately led up to his plea agreement and his testimony.  For the reasons stated in denying discovery on this issue, the Court finds no error.   See Rec. Doc. 1475.


Claim VII: The Prosecution Relied Upon Evidence Concerning The Impact Of The Offense On Bank Tellers, And Other Members Of The Community In Order To Secure A Death Sentence

In this claim, defendant Johnson contends that the bank teller testimony constituted

victim impact evidence beyond what is permitted under 18 U.S.C. § 3593, because the tellers were not family members. The defense also challenges the government's closing argument during the selection phase which referenced the bank employees as "people who tried to make our lives better, get us mortgages, get us car loans..." Rec. Doc. 1273, pp. 54-55, and which also referenced the terror they experienced during the crimes. *Id.* at p. 8.

Section 3593, the relevant section of the Federal Death Penalty Act, 18 U.S.C. §§ 3591-3599 ("FDPA"), concerns the character of the victim and the impact of his loss on family members. In many if not most instances, as was true here, none of the victim impact witnesses were present during the crime, hence the need for a specific statutory authority allowing their testimony and evidence.

The bank employees were witnesses to the actual crimes and their testimony was to establish the elements of the offenses. As the government correctly points out, one of the statutory aggravating factors alleged and found was that the defendant knowingly created a grave risk of harm to more than just the victim, Sidney Zaffuto. Rec. Docs. 1221-1, 1221-2. Likewise, a non-statutory aggravating factor was the taking of a hostage in the bank. Rec. Docs. 1238-1, 1238-2. The evidence elicited was probative of the crimes themselves, and the aggravating factors.

The evidence was also relevant to the harm caused by the defendant and his blameworthiness. Consequently, it was proper for the prosecution to comment on that evidence in closing argument. With regard to the reference to mortgages and car loans, no prejudice can be gleaned from what is common knowledge of activities of bank employees.

The Court finds no error.

Claim VIII: The Prosecution's Summation Improperly (And Unfairly) Injected "Future Dangerousness" Into The Penalty Phase Weighing Process

This claim involves whether the prosecution improperly and unexpectedly injected "future dangerousness" into the penalty proceedings, after abandoning it as a non-statutory aggravating factor earlier in the proceedings.

Defendant Johnson also claims that his counsel requested at the close of the penalty phase an additional mitigating factor that "no evidence" was presented to indicate Johnson would be a danger to prison staff or other inmates if sentenced to life imprisonment.[21]

At issue are the following remarks made in the rebuttal summation by the government:

> He was bad in 1974, and nothing you have heard over the past couple of weeks would make you not think he's still cold and calloused today. John Johnson cannot and he will not ever be rehabilitated. Ladies and gentlemen, he just doesn't have it in him.

Rec. Doc. 1273, p. 62.

> He was given a second chance in 1974 when he escaped justice for the murder of Joe Gennaro. And what did he do with that second chance? Did he become a better man? Did he become a law-abiding man? No. He continued to use heroin. He continued to rob banks. He continued to intimidate decent people, hardworking citizens. And he decided to murder a deputy sheriff who was working a detail. That's what he did with his second chance. Don't give him a third chance.

*Id.*

The Court finds that the comment, in context, was a proper argument that Johnson had squandered prior opportunities to lead a law-abiding life and had failed to do so. The most reasonable interpretation of the summation was that Johnson did not deserve any more "breaks" in terms of the consequences for his continued criminal behavior. The comments also focused exclusively on the defendant's behavior when not incarcerated, making no reference to his conduct, good or bad, while in custody.

---

[21] The Court took the position that since no evidence at all was offered regarding the defendant's conduct while incarcerated, favorable or unfavorable, the instruction was not appropriate. The jury had no information upon which to base any conclusion. Rec. Doc. 1253, pp. 97-98. Such evidence was presumably readily available to both sides, yet neither chose to introduce it.

The Court finds no error.

## Claim XI: The Prejudicial Effect Of The Iberia Bank 911 Tape Far Outweighed Its Probative Value And Should Have Been Excluded

In Claim XI, the defendant reurges its pre-trial argument against the admission of the telephonic 911 tapes from Iberia Bank employee "J.O." to police operator #186 on January 8, 2004, during the robbery. The defense specifically claims that "[t]his tape was irrelevant to any disputed fact at trial and served only to further inflame the jury with the terror and emotion of the robbery/murder" which "contributed to a death verdict based upon, passion, prejudice or any other arbitrary factor" for purposes of 18 U.S.C. § 3595. Rec. Doc. 1337, p. 55.

The Court previously ruled that the first part of the tape was admissible, excluded the remaining part of the tape between J.O. and emergency medical personnel and denied the defense motion for further redaction. Rec. Docs. 376, 792. In the redacted taped recording introduced in the guilt phase of trial, the eyewitness J.O. provided information relative to the crime and events as they transpired and begged the operator not to hang up, to send the police and an ambulance, and repeated her fear that she was going to be killed.[22] The Court specifically found that this part of the tape was relevant and that its probative value was not substantially outweighed by the danger or unfair prejudice for purposes of Fed. R. Evid. 403. For the record, the Court again acknowledges that this evidence was highly emotional and powerful, but still maintains that it did not create a danger of unfair prejudice that substantially outweighs its probative value. *Old Chief v. United States*, 519 U.S. 172 (1996); *United States v. Powers*, 168 F.3d 741 (5th Cir. 1999); *United States v. Salameh*, 152 F.3d 88 (2nd Cir. 1998).

---

[22]The Court has reviewed the tape that was introduced at trial, 2 minutes and 41 seconds in length, and is satisfied that the tape was properly redacted in accordance with its order.

This claim is denied.  The Court finds no error.


Claim XII: The Government Falsely Insinuated To The Jury That John Johnson Had Committed The Robbery And Battery Of Adel Zubhayer (sic)

In this claim, the challenges the government's cross-examination of Adel Zughayer ("Zughayer"), who was called by the defense during the penalty selection phase to testify about a June 1, 2001, robbery in an effort to impeach the credibility of the deposition testimony of co-defendant Jones.   Specifically, Zughayer testified in response to the defense questions on direct that in March 2009, he identified photographs of Jones as the perpetrator of that crime.  Jones testified "I don't remember" when asked if he was the perpetrator at his video deposition played for the jury.   Exh. P4A, p. 96.

On cross, however, Zughayer acknowledged that he was shown another photograph, which turned out to be of defendant Johnson, the day before his trial testimony and also identified him as the possible perpetrator.

Thereafter, the parties stipulated that Johnson was in federal custody on June 1, 2001. Rec. Doc. 1253, p. 89.  The defense now argues that the government should not have suggested "that the photograph in No. 33 belonged to John Johnson."   Rec. Doc. 1337, p. 58.  Although this testimony may have been confusing, the Court finds no error.


Claim XIV: The Government Did Not Establish Beyond A Reasonable Doubt That Death Was The Appropriate Punishment

In this claim, the defense challenges another ruling of the Court pertaining to the appropriate standard to be used by the jury in the penalty selection phase.   The defense requested a charge that the death penalty should not be imposed unless a unanimous jury determined beyond a reasonable doubt that death was the appropriate punishment.   The

defendant argues that the failure to give this charge violates the rules set forth in *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Because the penalty predicate determinations are factual determinations, according to the defendant, unless they are found beyond a reasonable doubt, the maximum penalty is life imprisonment under *Blakely v. Washington*, 542 U.S. 303 (2004). The defendant candidly acknowledges Fifth Circuit case law to the contrary, including *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007), but maintains that without application of the enhanced burden of proof, the FDPA violates the Fifth, Sixth and Eighth Amendments.

The Court's pre-trial rulings on this issue are based squarely on the Fifth Circuit jurisprudence set forth in *Fields,* 483 F.3d at 346 and *United States v. Flores*, 63 F.3d 1343, 1376 (5th Cir. 1995). Rec. Docs. 773, p. 4, 1253, pp. 103-104. This claim must be denied and the Court finds no error.


Claim XVI: Count III Of The Indictment Does Not Present A Basis To Impose The Death Penalty

In this claim, the defense mistakenly assumes that the typographical error contained in Count III of the Second Superseding Indictment was not resolved prior to trial, and that the error "precludes the defense from adequately addressing the question whether *Simpson* or *Gonzalez* in Claim I applies." Rec. Doc. 1337, p. 73. Prior to trial, counsel for the defendant adopted the proposed jury instructions and objections of the co-defendant Smith. Rec. Docs. 773, 727, 726. At a hearing regarding jury instructions held on February 27, 2008, with Johnson's counsel present, the reference to "Section 924(i)(1)" in Count Three was discussed. It was agreed that the reference would remain as typed after counsel for the co-defendant Smith advised that, "[w]e care about the instruction of the charge, not the letter." Rec. Docs. 916, p. 6, 744.

The Court finds that the defendant has waived objection as to this claim. In any event,

there was no confusion as to the applicable section at any time during trial and the defendant suffered no prejudice. The Court finds that this claim has been waived and that there is no error.

## CATEGORY III: INSUFFICIENT INDIVIDUAL ERROR: Claims III, XIII

### Claim III: The Overwhelming Presence Of Uniformed Police Officers, Along With The Government's Reliance In Closing Argument On A Non-Statutory - Never Been Noticed - Ground for Imposing The Death Penalty, Rendered The Death Penalty Sentence Fundamentally Unfair

In this claim, defendant Johnson contends that the prosecution (a) improperly emphasized Sidney Zaffuto's status as a law enforcement officer to justify the death penalty; (b) that such status is not a statutory aggravating factor under federal law, nor had it been listed by the government as a non-statutory aggravating circumstance, and ( c) that the presence of uniformed police officers during the trial prejudiced him.

Turning first to the second complaint, (b) that Zaffuto's status as a deputy sheriff is not a statutory aggravating factor under federal law, nor had the government listed it as a non-statutory aggravator, the defense is correct on both points. However, the Court finds no prejudice. Defendant Johnson has been well aware since the outset of the case that the victim was a deputy sheriff acting in the course of his duties as a security guard. This was clearly part of the facts and circumstances of the offense, hence appropriate to be commented upon in argument. The Court also knows of no legal obstacle to the government citing Zaffuto's status as a law enforcement officer as a non-statutory aggravator, had it chosen to do so. Arguably the defendant benefitted from not having that additional aggravator specifically listed on the verdict sheet and weighed against him.

Turning next to the third complaint, (c) defendant Johnson claims that the presence of law enforcement officers in uniform during portions of the trial prejudiced him. More

specifically, Johnson complains that on May 19, 2009, during the testimony of Deputy Sheriff Andrew Jenkins,  more than forty uniformed members of the Orleans Parish Criminal Sheriff's Office, including the Sheriff himself, were seated in several rows behind the prosecution side of the courtroom.   A "significant" number remained during closing argument on the guilt phase and six to eight deputies, in uniform, were also present on the morning of May 20,2009, during the eligibility phase.   Rec. Doc. 1272, p. 46.   The defense did not object to their presence *per se*, but rather to the officers being in formal law enforcement uniform.[23]  Rec. Doc. 1215.  This was considered unduly inflammatory and inappropriate, and the defense requested that any law enforcement officer who wished to appear, be instructed not to appear in uniform; that request was rejected by the Court.   Rec. Doc. 1272, pp. 46-47.  The Court at this time does acknowledge that several dozen law enforcement officers, in full uniform, did in fact occupy several rows in the audience during the testimony of Deputy Jenkins and at least some were there on other days, including during the closing arguments of the guilt phase.

In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the defendant complained that added security officers in the courtroom, specifically,  four uniformed state troopers,  prejudiced him.  The Supreme Court found no prejudice since the presence of the four additional security officers would be, at best, ambiguous to a jury.  Since jurors in general are not familiar with courtroom procedures, they may well not attach any significance to security, or at most assume officers are present to prevent any disruption, and not infer anything negative about the defendant. Nevertheless, the Supreme Court did acknowledge that a "roomful of uniformed and armed policemen" might pose a threat to the fair trial rights of a defendant,  and likewise suggested that a better practice would have been to have the security officers not readily identifiable as law enforcement, citing several cases in which the courtroom security were in plain clothes.   *Id.*  at 570-571,  572.

---

[23]Presumably if the officers had been in lay clothes, the jury would not have known them to be law enforcement officers, as opposed to just interested citizens.

This case, of course, involved a murder victim who was a law enforcement officer and the deputy sheriffs present were not there to provide courtroom security. Indeed, it would be difficult for any juror to not recognize that the Orleans Parish deputies who were present, were there to show support for their colleague, Orleans Parish Deputy Jenkins, as well as pay tribute to their fallen colleague, Deputy Sidney Zaffuto. The Mississippi Supreme Court has specifically noted that "in capital murder cases where the victim was a member of law enforcement, the *potential exists* for a coercive atmosphere when uniformed law officers sit together in a group. Consequently, we discourage this practice." *Balfour v. State*, 598 So.2d 731, 756 (Miss. 1992)(emphasis original). As in *Holbrook*, the Mississippi Supreme Court suggested the "overbearing influence is easily diffused" if the court would require the police officers to attend in street clothes or else disperse the uniformed personnel throughout the courtroom. *Id.*

In *Phillips v. State*, 70 P.3d 1128 (Alaska Ct. App. 2003), the defendant was charged with murdering a state trooper. Uniformed law enforcement officers attended the beginning days of the trial. The court refused defense counsel's request that the officers be required to appear in street clothes. The judge, however, did subsequently order that no more than five uniformed officers could appear on any one trial day. The Alaska appellate court acknowledged that the "appearance of law enforcement officers *en masse* in the spectator gallery posed a threat that the jurors would feel implicit pressure to return a verdict favorable to law enforcement interests or sentiment." *Id.* at 1137. See also *Powell v. State*, 897 S.W.2d 307 (Tex. Crim. App. 1994).

In light of the above, the Court recognizes that it erred and should have granted the defense motion and insisted that any appearances by law enforcement in the audience be in plain clothes. Furthermore, the Court should have anticipated that this might happen and issued such an order in advance, not after the fact when the potential unfair prejudice had already occurred.[24] However, the *en masse* uniformed appearance occurred on only one day, during the guilt phase.

---

[24]In the event of retrial, the Court will issue an appropriate order to that effect.

In this case, guilt was in essence a forgone conclusion. No further *significant* police presence occurred thereafter. While the *en masse* appearance was inappropriate, it was not in and of itself sufficiently prejudicial to deprive Johnson of a fair trial. However, it is a part, albeit a small part, of the overall totality of circumstances justifying a new penalty hearing.

Defendant Johnson's final complaint with regard to Sidney Zaffuto's status as a law enforcement officer is whether the prosecution's emphasis of that fact in questioning witnesses and in closing argument crossed the line into inciting unfair passion and prejudice against the defendant. The following passage is challenged from the government's closing argument in the guilt phase: "Deputy Zaffuto awoke on the morning of...January 8th, strapped on his sidearm, and he went to the bank to do what he did every day. Serve and protect the people of Orleans Parish. He dedicated his life to the people of that parish." Rec. Doc. 1251, p. 101. During the questioning of the victim impact witnesses during the eligibility phase, the prosecutor emphasized the victim's devotion to law enforcement with questions such as, "[i]s it fair to say he was a lawful (sic) officer 24 hours a day?" and "[d]id he enjoy his work?" Rec. Doc. 1274, at pp. 11-12. One of the victim impact witnesses, Terry Zaffuto, was the deceased's brother and also a law enforcement officer, who testified to becoming a deputy at his brother's behest. *Id.* at pp. 12-15. The prosecutor specifically asked Terry if, considering how his brother died, he thought him to be a hero. Terry's response was that he considered him a hero not just that day but every day that he served to protect others. *Id.* at p. 18. Linda Kelly, the deceased's sister, also testified. She read her eulogy from the funeral which stated in part:

> My other brother, Terry, who is also a police lieutenant, said it the best, Sidney wasn't just a hero the day those men took his life, he was like every other officer, a hero every day they walk out of the door to protect the public.
>
> I am so enormously proud of my brother. After hearing Sheriff Foti say he viewed the films and Sidney was a hero who probably saved a lot of tellers' lives that day, I couldn't be prouder. And knowing him, there was no other way for him that day even if it meant giving his own life.

***

> I salute my brother here today, the finest of officers and my hero, his loving sister, or as he called me "sis."

*Id.* at p. 23.

Linda Kelly also read a letter to the editor she wrote which noted that "hundreds of officers" from many different police departments in the state came to the funeral, and that the funeral included "an Honor Guard, a 21-gun salute and bagpipes that played *Amazing Grace*." *Id.* at p. 24. The letter continued:

> He died that day to protect the tellers at the bank, something he always did, protect the public. So often we forget that these men risk their lives every single day when they walk out the door and they do it for a lot less money than it is worth. Without them, life would be chaotic and people would have to fear walking out their door every day.

*Id.* at p. 25.

Finally, the defendant challenges comments made during the closing argument in the selection phase of the sentencing hearing.

> It means so much more because we all now know, if we didn't before, what it means for an officer to lace up his boots, to put on a uniform and go protect us every day.

Rec. Doc. 1273, p. 5.

> ...the government thought that he [Captain Jenkins] was a hero, who, like Sidney Zaffuto, put a gun on every day, went into those banks, did these details to protect people, to protect the tellers, to protect the customers, to protect the loan officers, people who tried to make our lives better, get us mortgages, get us car loans, do those sorts of things. I thought he was a hero. I thought doing something like that, serving your community, made you a good person.

*Id.* at p. 54.

> ....if you want to shed a tear, shed a tear for the City of New Orleans because we lost one of our best and we lost one of our bravest.

*Id.* at p. 56.

Finally, according to defendant Johnson, the closing argument ended with the prosecution asking for the death penalty *because* the victim was a police officer.

> We are here because of the choices the defendant made. We are here because a brave man is dead. Remember the victim. His name was Sidney Zaffuto. We are here because the defendant killed a police officer.

*Id.* at p. 60.

> When a career criminal kills a police officer, he deserves the death penalty.

*Id.* at p. 67.

> Anything less than a sentence of death in this case is a failure of will and a wholly inadequate response to the senseless murder of a man who dedicated his life to protecting us.

*Id.*

> Make no mistake about it. And if it must - and it must be, it must be imposed in this case because if not him, who? If not when - if not now, when? Because if killing a police officer after executing a restaurant owner is not enough, what is?

*Id.* at p. 69.

The Court finds that the testimony regarding Deputy Zaffuto's career as a law enforcement officer was appropriate victim impact evidence. The Court also finds that the prosecutorial arguments based on his status were, by and large, proper. Deputy Zaffuto was in fact serving in a law enforcement capacity at the time of his death, doing precisely what his duties called for - protecting the bank from would be bank robbers like the defendant. In addition, defendant Johnson knew Deputy Zaffuto was a law enforcement officer at the time he was shooting at him. Furthermore, the prosecution had properly elicited evidence of Deputy Zaffuto's long career as a police officer, his love of his job and the high esteem with which he was held by his colleagues.

The Court's only reservation is those portions of the government's rebuttal argument

which improperly *demanded* that a death penalty be imposed, in part because Deputy Zaffuto was a law enforcement officer. Those concerns however are more appropriately addressed under Claim IX, where the defendant claims the prosecution's penalty phase summation was designed to inflame the jurors' emotions and passions.


<u>Claim XIII: The Restriction of Mitigation And The Limitation On The Court's Instructions</u>
<u>Concerning Consideration Of Mitigation Undermined The Reliability Of The Proceeding</u>

The crux of this claim is that the Court improperly merged several of defendant Johnson's mitigating factors into one *in globo* factor.[25] Specifically, the defense had requested the following as independent mitigating factors:

The Defendant was a good and loving son, brother, father and grandfather.

The Defendant's family would suffer greatly if he were executed.

The Defendant's life had value.

The Court combined the three into one mitigator that read: "His life had value in that he has been a good and loving son, brother, father and grandfather and his family will suffer greatly if he is executed." Only one juror checked this as a mitigating factor. Rec. Doc. 1238-1, p. 5; 1238-2, p. 5.

The Court agrees that it erred in combining all three of these factors into one. Compelling evidence was introduced by Johnson's family members indicating that his life did have value to them and they would in fact suffer greatly if he were to be executed. However, jurors could have also concluded that in light of his overall history, particularly his criminal history, that he had not in fact been "a good and loving son, brother, father and grandfather."

---

[25]Defendant Johnson also repeats his complaint that a videotape and letter detailing his remorse and acceptance of responsibility was disallowed. See Claim IV.

Nevertheless, the Court concludes the error was not unduly prejudicial.   The jury did in fact hear extensive testimony of the defendant's value to the members of his family as well as others, and could have considered it on an individual basis regardless of how the mitigator was phrased on the verdict sheet.   In the event of a new penalty phase hearing, this mitigator will be severed into two if requested by the defense.

Finally, defendant Johnson alleges that his own conduct during the trial should have been listed as a relevant mitigating factor.   The Court takes judicial notice of the fact that defendant Johnson sat impassively throughout the trial and did not react to the testimony of either the prosecution or defense witnesses.   The Court also notes that his demeanor, while certainly not disruptive, was otherwise ambiguous.   His non-response to the highly emotional victim impact evidence, for example, could be construed as commendable stoicism or heartless indifference.   Nevertheless, the defense has cited a number of cases which have allowed similar mitigators and in the event of a new penalty phase hearing, the Court will give it reconsideration.


## CATEGORY IV: SUFFICIENT INDIVIDUAL ERROR: Claims I, II, IX, X

The Court finds four individual claims, each of which present error sufficiently serious to constitute a miscarriage of justice under Rule 33.   All were committed by the prosecution during the critical selection  phase of trial, and the Court finds that each caused prejudice to the defendant's constitutional rights sufficiently serious to warrant a new sentencing hearing.

Rule 33 error is evaluated "against the record as a  whole," which includes the evidence presented in these proceedings relevant to the sentencing selection.  *Wall*, 389 F.3d at 466.  Part of the Court's measurement as to the effect of error includes consideration of the mitigation evidence presented by the defendant at this same selection of trial.[26]   The Court is well familiar

---

[26]As reflected by the findings of one juror as to each, the defense put on testimony from members of Johnson's family consistent in its content that Johnson had been generous with his

with capital cases in general, and this case was unusual in the extent of *positive* mitigation testimony offered on Johnson's behalf.   Among the witnesses were Shalinda Johnson, the defendant's daughter;   Tobias Calvey, the defendant's grandson;  Andreca Johnson, the defendant's granddaughter; two of his nieces, Misunique Byes, Calrika Johnson, and a nephew, Kareem Johnson.   They all testified consistently that Johnson had been the only father figure in their lives,  that he was actively involved with them throughout their lives, and encouraged them to stay in school, to value themselves as people, to avoid bad influences and negative peer pressure, and to stay clear of drugs and guns.[27]  They also testified to him helping them all financially and that even when in jail, he stayed in contact and continued to be supportive.[28] Most of these family members were college educated or college bound.  They indicated that Johnson would continue to be a positive part of their lives if he received a life sentence.  The Court observed the demeanor of these witnesses and they were clearly sincere and genuine in their love for and gratitude to Johnson for the positive impact he had had on their lives.


Claim I:  The Erroneous Admission Of Impermissible "Victim Impact" Testimony Introduced Arbitrary Factors Into The Jury's Sentencing Determination

Claim I and Claim II are closely related and the underlying facts simultaneously occurred during the selection phase.  In Claim I, defendant Johnson argues that an Eighth Amendment violation occurred when Shirley Zaffuto, the widow of the victim, Sidney Zaffuto, read a

---

time and money and supportive to them throughout their lives and that they saw his life as a heroin addict as an aberration.   Rec. Docs. 1238-1, 1238-2.

[27]Rec. Doc. 1274, pp. 82-117, Rec. Doc. 1253, pp. 15-47.

[28]Other witnesses, including Johnson's mother and sister, testified to the hardships of Johnson's upbringing.

statement before the jury in which she castigated the defendant and his co-defendants.   The

defense challenges the following passages in particular:

> ...three selfish, greedy criminals tried to take what others had earned through their hard work.   You and your friends terrorized innocent bank employees and customers and killed my beloved Sidney when he and another officer tried to stop you.
>
>           \*\*\*
>
> My health has suffered, and I'm alone now because of the decision made by you and your evil friends.
>
>           \*\*\*
>
> You are an evil man and your life is a disgrace.

Rec. Doc. 1274, pp. 35-36.

Mrs. Zaffuto sobbed as she read the letter, having to pause several times to try to

compose herself and continue, then breaking down entirely once the letter was read.

Defendant Johnson also contends the error was compounded when in closing rebuttal

argument, the prosecutor used the "evil"vocabulary supplied by the widow in its selection phase

rebuttal argument.

> People who do <u>evil</u>, people who are <u>evil</u>, deserve justice.  Make no mistake.  John Johnson is <u>evil</u>.  Justice, justice can only be had in this case if the death penalty is imposed.

Rec. Doc. 1273, p. 68 (emphasis added).

The Eighth Amendment bans cruel and unusual punishment.   With respect to capital

cases, the Supreme Court has consistently held that the Amendment requires that any death

sentence be structured to eliminate arbitrary death verdicts.

> the penalty of death is different in kind from any other punishment imposed under our system of criminal justice.  Because of the uniqueness of the death penalty,

> *Furman*[29] held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.

*Gregg v. Georgia*, 428 U.S. 153, 188 (1976).

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court considered the admissibility of two types of victim-related information in the penalty phase of a capital case. The first was descriptions of the personal characteristics of the victim and the emotional impact the loss had upon the family members. The second was the family members' opinions of the defendant, and their characterization of the crime. The Court held both types of information to be irrelevant to the decision to be made by the jury, and unfairly prejudicial to the defense under the Eighth Amendment.

With respect to the second category of information, the family members' opinions of the defendant and their characterization of the crime, the Supreme Court specifically held that:

> ...the formal presentation of this information...can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. As we have noted, any decision to impose the death sentence must "be, and appear to be, based on reason rather than caprice or emotion." ... The admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decision making we require in capital cases.

482 U.S. at 508-509, quoting *Gardner v. Florida*, 430 U.S. 349, 358 (1977). In *South Carolina v. Gathers*, 490 U.S. 805 (1989), the Court held that prosecutorial comment on prohibited victim impact evidence was likewise improper.

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court reversed itself with regard to the first type of victim impact evidence describing the personal characteristics of the

---

[29]*Furman v. Georgia*, 408 U.S. 238 (1972).

victim and the loss suffered by the victim's family.   The Supreme Court held that evidence of the harm caused by the murder is relevant to the blameworthiness of the defendant, and also to show the uniqueness of a victim as an individual human being.  Significantly, though, no evidence regarding the family members' views of the crime or the defendant were presented in *Payne.*  The Court  overruled *Booth* and *Gathers* only insofar as those decisions disallowed evidence or argument regarding the victim's characteristics and the impact of the loss on the family.  *Id.* at 830, n. 2.

Subsequently to *Payne*, several federal courts of appeals, including the Fifth Circuit, have specifically held that the *Booth/Gathers* Eighth Amendment still prohibits victim comment on the crime, the defendant and the penalty sought.  In  *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002), the trial court admitted a written statement from the victim's mother that read: "I'm sorry for you, for your heart to be so hard, you couldn't even see the innocence of the two you've killed."  *Id.* at 9.   The victim's father testified in part:

> I truly believe that on June 21st, 1999, our children were tragically and recklessly stolen from us.  There was no profit to be gained, no angry exchange, it was just a useless act of violence and a total disregard of life.

*Id.*   The Fifth Circuit held that the portion of *Booth* prohibiting this sort of comment was not overruled by *Payne*.   It further found that even though defense counsel failed to object at trial, the error in admitting the testimony was plain.[30]  *Id.*

---

[30]Although the Court's analysis need go no further, other federal circuits agree with this rule of law.  See *Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir. 2005)("...the *Payne* Court did not alter *Booth*'s holding that admitting evidence of the victims' opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment...");  *Parker v. Bowersox*, 188 F.3d 923, 931 (8th Cir. 1999)(post-*Payne* decision holding that victim family members may not give characterizations of the crime, the defendant or the appropriate sentence); *United States v. Mitchell*, 502 F. 3d 931, 990 (9th Cir. 2007)(victim comment critical of the defendant "was an inadmissible opinion about (the defendant)'s crime and the error was obvious because victim impact statements 'set[ting] forth the family members' opinions and characterizations of the

Clearly, the portions of Shirley Zaffuto's letter referring to defendant Johnson as "evil," declaring his life a "disgrace" and referring to all three defendants as "selfish, greedy criminals," who "terrorized innocent bank employees and customers" was an Eighth Amendment violation, and the Court so finds. At the March 23, 2010, hearing on the post-trial motions, the prosecution acknowledged possessing this statement, or earlier versions of it, months before trial. The Court is disturbed and dismayed that the prosecutors themselves, one of whom has extensive capital experience, did not on their own excise the improper comments. At oral argument, the prosecutor conceded that Mrs. Zaffuto's characterization of the defendants as "evil" was not appropriate.

The government essentially argues lack of prejudice: that the remark about the bank employees being terrorized was cumulative to the testimony of the employees themselves and that the defendant exaggerates the impact and importance of the remaining comments. It also points out that Mrs. Zaffuto was just one of four victim impact witnesses and her statements "were a small part of the government's case in aggravation" and that the Court must consider the entire penalty phase proceeding. Rec. Doc. 1397, p. 12. The prosecution also notes that it was "hardly a surprise" that Mrs. Zaffuto would be angry at the defendant. *Id.* It maintains that "murderers are evil" and testimony is not necessary for that fact to be argued to a capital jury.

---

crimes and the defendant' are 'irrelevant to a capital sentencing decision.'"); *Hain v. Gibson*, 287 F.3d 1224, 1238-1239 (10th Cir. 2002)("To date, three circuits, including our own, have expressly recognized that the portion of *Booth* prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in *Payne* and remains valid." ); *United States v. McVeigh*, 153 F.3d 1166, 1217 (10th Cir. 1998)("...*Payne* did not overrule the prohibitions in *Booth* against the admission of 'information concerning a victim's family members' characterization of and opinions about the crime, the defendant, and the appropriate sentence.'"); *United States v. Brown*, 441 F.3d 1330, 1351 (11th Cir. 2006)("...the *Booth* prohibition against evidence of family members' opinions and characterizations of the crime, the defendant, and the appropriate sentence remains good law.").

*Id.* It also faults the defense for not requesting a curative instruction.[31]   *Id.* at pp. 12, 14.

Having found error in the admission of this challenged evidence, the issue becomes whether the error warrants a new penalty phase hearing.    To put context to this serious issue, Mrs. Zaffuto was among four family members who testified as to the character of Sidney Zaffuto and the impact of his loss on their lives.   All the testimony was emotional, the witnesses themselves, both male and female, breaking down into tears.    The Court was acutely aware of the impact upon the jury, as members of the jury were likewise in tears or otherwise obviously moved.   The transcript alone cannot capture the emotional impact that permeated the courtroom with this testimony.  To that extent, the Court concurs in the observations of U.S. District Judge Mark Bennett in *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa, 2005):

> I cannot help but wonder if *Payne v. Tennessee* (citation omitted) which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony in the *Honken* trial and the juror's sobbing during the victim impact testimony still rings in my ears... (S)uch potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination... on the improper basis of inflamed emotion and bias-sympathetic or antipathetic, depending on whether one is considering the defendant or the victims' families...

The Court accepts the fundamental fact that permissible victim impact evidence is inherently emotional.  Even in *Payne*, however, the Supreme Court acknowledged that while victim impact evidence is proper information for the jury to hear in assessing the penalty, such

---

[31]The defense objected to the written statement after it was read at trial.   For reasons stated in its ruling on Claim II, the Court finds that the defense objection was timely.  The defense requested a mistrial which was denied.  Faced with a production issue not readily resolved, and a trial nearing completion, the Court declined to even consider granting a mistrial in light of the possibility that the jury would return a life sentence regardless of any error.   No curative instruction was requested or given.

evidence may nonetheless be "so unduly prejudicial that it renders the trial fundamentally unfair," in which case the Due Process Clause provides for a new sentencing hearing.[32]  *Payne, 501 U.S. at 825.*

This Court is not suggesting that the *bona fide* victim impact evidence that was introduced in this case reached that level, in and of itself.   What the Court is saying, however, is that the highly charged emotional content of the victim impact testimony created an atmosphere of overwhelming sympathy for the victim and the victim's family, along with the attendant genuine danger that any other unharnessed appeal to passion, prejudice or sympathy was likely to tip the scales into a Due Process violation of fundamental fairness.   This is what the Court firmly believes happened at this trial and it began with the prosecution's  *Payne* violation.

While Mrs. Zaffutto was one of four victim impact witnesses,[33] her testimony, as the widow, was particularly compelling.   She  testified that she was a homemaker throughout their marriage and that she did not drive a car, relying on her husband to take her everywhere.   Rec. Doc. 1274, pp. 31-32. She referred to him as her best friend.  *Id*.   As she testified, she sat in the witness box, clutching a teddy bear in her arms which was dressed as a law enforcement officer. Her emotional dependency upon her husband and her helplessness in the face of his loss was visually obvious and truly heart wrenching.   It was at the end of this poignant testimony that she read the written statement, while continuously sobbing.   That statement in full follows, including the legally inadmissible portions:

---

[32]Victim impact evidence has also changed since *Booth*.  In *Booth*, the evidence was a report prepared by the probation department which was simply read to the jury.   In *Payne*, the evidence was the brief testimony of the deceased's mother/grandmother.   The victim impact in this case was significantly more extensive, affording more than just "a quick glimpse of the life petitioner chose to extinguish."  *Mills v. Maryland*, 486 U.S. 367, 397, 108 S.Ct. 1860 (1988).

[33]The others were the victim's brother, sister and the victim's step son.

My life and all joy in my life ended on January 8, 2004. On that day I lost my beloved husband, my best friend, my children's loving...father, my everything, my Sidney. I've waited for him all my life, this man who filled my life with love and laughter. Now he's gone and I will never be the same because three selfish criminals tried to take what others had earned through their hard work. You and your friends terrorized innocent bank employees and customers and killed my beloved Sidney when he and another officer tried to stop you.

I relive January 8, 2004, every day and night of my life. I still pray that I will wake up from this nightmare to find Sidney by my side. My health has suffered, and I'm alone now because of the decision made by you and your evil friends. You not only took my husband from me forever, you took my life away, as surely as you killed me too. Not only have you destroyed me emotionally but almost physically and financially as well. You took away my security, my well being and all of the light in my life. My future is uncertain and dark, not the safe, secure and happy place that it was when Sidney was by my side. We planned to spend the rest of our life together, to travel and just to enjoy life with one another. You took all that away from me. You are an evil man and your life is a disgrace.

Rec. Doc. 1274, pp. 35-36.[34] Immediately thereafter, the government elicited the explanation for the teddy bear, dressed as a law enforcement officer, and she explained that it contained a recording of her husband's voice. At that point, the defense called for a side bar, which lasted nearly five minutes, during which the widow continue to cry, holding the teddy bear depiction of her husband within feet of the visibly upset jurors. This sequence of events, including the sidebar, could have been easily predicted by the government.

The result is that the jury heard Mrs. Zaffuto's impermissible comments in the context of a highly charged emotional moment when their sympathies had to be totally vested in her plight, and was able to further feel her misery unattended by counsel and the Court during the five minute sidebar. When it later became clear that the government had not disclosed the substance of her written statement to the defense prior to trial as ordered, the error was even more seriously compounded.

_____

[34]The written statement from which the widow read includes the last sentence as a separate paragraph, which had been revised from the earlier draft. Exhs. D-19, D-19a.

The prosecution's attempt in its opposition to minimize her testimony as either cumulative or otherwise insignificant is further belied by their own closing argument. The government seized upon the opportunity it created for itself within a few moments into its initial closing argument, when the prosecutor spoke:

> about a man named Sidney Zaffuto, about how he laced up his boots on the morning of January 8, 2004, like he did every other day; about how he put on his uniform; about how he kissed his wife good-bye and about how he went to work.

> But as we stand here in closing arguments, it all means so much more. It means so much more because we now know Sidney Zaffuto... It means so much more because we now know that wife that he kissed good-bye on January 8th, Shirley Zaffuto. And we know now what his murder meant to her and how it's impacted her life.

*Id.* at p. 5.

Later in his initial close, the prosecutor returned to the poignant image of Mrs. Zaffuto:

> Ladies and gentlemen, here is a lady who was solely and completely dependant on Sidney Zaffuto. He drove her wherever she needed to go because she doesn't drive. He provided for her financially. He was her entire heart, her entire soul. And now that lady rides her bike to run her errands. She's lost his income. She's lost his health insurance. And she testified on the witness stand clutching the only reminder she has of her husband, a teddy bear dressed up like a police officer.

*Id.* at p. 20.

Likewise, in the government rebuttal, the prosecutor returned to the emotional victim impact testimony:

> You know, if you want to shed a tear, cry, cry for Sidney Zaffuto. If you want to shed a tear, cry for his wife, Shirley Zaffuto. Cry for her. She rides her bicycle to go to the bank. Shed a tear for Linda Kelly, Terry Zaffuto, his siblings, who will never hear that laugh again, the laugh they describe so lovingly. Shed a tear for Andrew Medina, the kid whose best memory of him is asking if he can call him dad. Shed a tear for his mother. She had to bury her own son.

*Id.* at p. 56.

Further along, he returned to the images from Shirley Zaffuto's written statement:

You see, for Sidney Zaffuto's wife, for his mother, for them, the pain, the pain will never cease, and the nightmare is never going to end. They're going to remember this every day for the rest of their life. It will haunt them. Believe me, it is going to haunt them.

*Id.* at p. 63.

Then at the end of the rebuttal, he evoked the specific and prohibitive language from her statement in exhorting the jury to impose the death penalty.

People who do evil, people who are evil, deserve justice. Make no mistake. John Johnson is evil. Justice, justice can only be had in this case if the death penalty is imposed.

As you sit there, you are not simply 12 people. You are the conscience of the community. You represent the United States. In this case, you are the dispensers of justice.

Shirley Zaffuto, Linda Kelly, Terry Zaffuto, Andrew Medina, they all wait for you to give them some justice... Justice can only be had, only be had, by imposing a sentence of death.

*Id.* at p. 68.

In light of the highly emotional impact of Shirley Zaffuto's testimony, the improper characterization of the defendants and the crime, and the prosecution then highlighting that same characterization during closing argument, the Court finds error sufficient in itself to warrant a new trial in the interest of justice. The Court finds that the impermissible remarks made in Mrs. Zaffuto her written statement, which the government could have and should have excised on their own, did contribute to the death penalty verdict and entitles the defendant to a new selection hearing.

Claim II:  The Payne Violation Occurred As A Result Of The Government's Discovery Violation

In Claim II, defendant Johnson makes the related argument that the prosecution violated discovery rules in failing to disclose pre-trial  (a) the written statement of Shirley Zaffuto; (b) the teddy bear carried by Mrs. Zaffuto to the witness box and (c) the audio tape of the victim's voice.  The Court finds that this issue has merit and deserves separate attention.

As early as January 2008, the Court ordered the government to proffer the evidence it intended to use regarding victim impact to defendant Johnson.   Rec. Doc. 710.     In its initial disclosure, the government identified Shirley Zaffuto as a witness who would testify about her marriage, her husband's police service and his relationship with members of his family.  She would also testify regarding the impact of the loss on her emotionally and financially.  Rec. Doc. 729, p. 7.   At a later date in March 2008, more than a year prior to trial, the prosecutor indicated that Mrs. Zaffuto might provide a letter in lieu of live testimony.    Rec. Doc. 904, p. 27.

At trial and at the post-trial hearing on March 23, 2010, the prosecutor represented that he believed he turned over to the defense the revised version of the written statement of Shirley Zaffuto at the same time as he turned over various newspaper clippings, photographs and other documents intended to be used as victim impact evidence in Spring of 2009 and did not remember making two separate disclosures.   Both attorneys for the  defendant testified that the materials received from the government did not contain the written statement.     The Court concludes, for several reasons, that the statement was not disclosed to the defense or the Court

prior to the testimony of Mrs. Zaffuto during the selection phase.[35]

First, the prosecution disclosure and *in globo* production to the defense was entered as a formal notice in the record under seal in March 2009, and it did not include any written statement by the widow. Rec. Doc. 1071. That filing included nine pages of attached letters, newspaper clippings and photographs, presumably the same disclosures made earlier to the defense. In responding to the disclosure, the defense likewise referenced nine pages of attachments, none of which was the written statement of Shirley Zaffuto. Second, during trial just prior to Mrs. Zaffuto reading the statement, the defense inquired of the prosecutor whether it had been disclosed, was assured it had been, and then objected and moved for a mistrial when it realized the contents were both unfamiliar and inadmissible. Third, the Court is convinced that had the defense received the statement prior to trial, it would have objected to the clearly inadmissible portions, and they would have been excised.

Finally, at the March 23, 2010, post-trial hearing, the government did provide to the defense and the Court what purported to be an earlier version of Shirley Zaffuto's statement, presumably the one they intended to initially disclose. That statement, while similar in many respects to the final version, is also dramatically different in that it appears to call for a penalty of life imprisonment rather than death.[36] The prosecution may well have withheld when it first

---

[35]The Court's own painstaking search did not locate a copy of the statement in the record.

[36]Noteworthy is that the original draft of the statement first produced by the government at the March 23, 2010, hearing, had the last sentence crossed out. The Court's reading of that sentence is "May you wake up every night for the rest of your life in prison with the nightmare of knowing that you will never live again as a free man." That sentence was replaced with "You are an evil man; your life is a disgrace." Exhs. 19, 19a. The Court's notes from the March 23, 2010, hearing, which can be confirmed by transcript in the event of an appeal, is that the prosecution admitted that, with regard to the difference in the "last part" of the statement, "[s]o I know that complicates things somewhat."

received it because it was inappropriate for Shirley Zaffuto to suggest a particular penalty and because the statement ran counter to the intention of the government to request the death penalty. The final version of the written statement was confected apparently at some later date, without the reference to life imprisonment, at which point the government failed to disclose it, perhaps thinking that it already had. The result: the government exposed the jury to clearly inadmissible and highly emotional evidence, appealing powerfully to the sympathies of the jury.[37] As previously indicated, the Court ascribes no bad faith *per se* to the government at this time; it does find, however, that the government's nondisclosure was inexplicably careless.

For present purposes, the Court accepts the government's representation that it was unaware that Mrs. Zaffuto was bringing the teddy bear in police uniform containing an audio tape of the decedent until the day of her testimony. Nevertheless, the prosecution became aware of it upon her arrival, apparently discussed it with her, perhaps listened at least to part of the recording and made the unilateral decision to present it to the jury without prior disclosure. Rec. Doc. 1274, pp. 37- 40. At a minimum, the government was under a clear obligation to advise the defense of its intention, in order to allow for any objection outside the presence of the jury. Instead, it chose to wait until after Mrs. Zaffuto's very emotional reading of her statement to ask her, in the presence of the jury, to explain the significance of the teddy bear in her arms. As she poignantly explained, the uniformed bear contained an audio recording of her murdered husband's voice. Even if the Court accepts the prosecution's representation that any failure to disclose the *written* statement was inadvertent, it can find no excuse, other than gamesmanship,

---

[37]In its opposition, the government contends it was not obliged, under the Jencks Act, to produce the written statement until after the witness testified. However, the government voluntarily agreed to produce all Jencks Act material prior to trial, and the defense was entitled to rely upon that agreement. Furthermore, as already noted, the Court had ordered disclosure of the victim impact evidence in advance of trial.

in the government's failure to alert the defense and the Court to the intended use of the teddy bear and the audio recording. The government's decision was not only careless, but deliberate.

At the inevitable sidebar that resulted, while the agonized widow remained on the stand in full view of the jury, choking with tears while holding the teddy bear depiction of her murdered husband, the defense objected and moved for a mistrial. The Court disallowed the playing of the audio recording, but denied the motion for mistrial. Rec. Doc. 1274, pp. 37-40. Given what the Court now knows about the non-disclosure, declaration of a mistrial would have been appropriate, but again the Court's concern was to await the jury verdict in the event the death penalty was not imposed. As already noted, the victim impact evidence was compelling, emotionally charged and unforgettably sad. Mrs. Zaffuto's misery was palpable. In denying the mistrial at sidebar, the Court was attempting to cabin the error caused by the government at least to some degree, knowing that the damage was done to the extent that the jury was already made aware of the significance of the teddy bear, the recording and its contents. Had the government timely disclosed the evidence, the defense would have had an opportunity to object outside of the presence of the jury, the jury would have been unaware of the recording, which the Court would have ruled inadmissible for exactly the same reasons that it now finds it to be sufficiently prejudicial to deprive the defendant of a fair trial. The Court also specifically finds that the objection to the widow's statements, the teddy bear and its tape recorded message of the decedent was timely made under these circumstances.

This evidence attendant to the testimony of this palpably suffering widow transformed permissible victim impact evidence into constitutional error, and, for reasons further described hereinafter, warrants a new selection phase hearing. At the same time, it provided the government with a recurring theme for its closing argument, where the prosecution deftly turned the widow's own words into a mandate from the widow to sentence the defendant to death.

The Court finds that measured against the most stringent standard, this error alone produced a miscarriage of justice and warrants a new hearing under Rule 33. If the original statement or revised version from the widow been disclosed as required, the defense would have objected and the statement would have been edited so as not to contain erroneous comment. In light of the substance of the original statement, which could have been construed as a request for a life sentence, Mrs. Zaffuto's revised statement at trial would not have been susceptible of conversion into a implicit directive for the death penalty.

Claim IX:  The Prosecution's Penalty Phase Summation Was Designed To Inflame The Juror's Emotions And Passions

In Claim IX, defendant Johnson is critical of "(v)irtually every aspect of the prosecution's final summation" as "calculated to inflame the passions and prejudices of the jury."  Rec. Doc. 1337,  p. 49.  The Court finds merit in much of what the defendant contends as it pertains to the government's argument at the critical selection phase of trial, especially when the nature of the role of the government attorney, and the attendant responsibilities, are acknowledged.   The United States Supreme Court, in the oft-quoted passage from *Berger v. United States*, 295 U.S. 78, 88 (1935), explained its appreciation as follows:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

The Fifth Circuit has long acknowledged the "double burden which the United States Attorney carries " as set forth in *Berger*. *Hall v. United States*, 419 F.2d 582, 588 (5th Cir. 1969). It "carried that doctrine forward" in *Handford v. United States*, 249 F.2d 295, 296 (5th Cir. 1957) as follows:

A United States district attorney carries a double burden. He owes an obligation to the government, just as any attorney owes an obligation to his client, to conduct his case zealously. But he must remember also that he is the representative of a government dedicated to fairness and equal justice to all and, in this respect, he owes a heavy obligation to the accused. Such representation imposes an overriding obligation of fairness so important that Anglo-American criminal law rests on the foundation: better the guilty escape than the innocent suffer. In this case zeal outran fairness.

*Hall*, 419 F.2d at 588, quoting *Handford*, 249 F.2d at 296. Improper prosecutorial arguments must be carefully reviewed because of how they are perceived by the jury.

In considering the impact of what is said the court also must be concerned with the great potential for jury persuasion which arises because the prosecutor's personal status and his role as a spokesman for the government tend to give to what he says the ring of authenticity. The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says.

*Hall*, 419 F.2d at 583-584. See also *United States v. Gracia*, 522 F.3d 597, 602 (5th Cir. 2008); *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999). "[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985). In a capital case, with the consequences of error so serious, any

prosecutorial misconduct must be carefully scrutinized.[38]

a. "Comparative worth" argument

Defendant Johnson first criticizes the following passage in the rebuttal argument as an inappropriate "comparative worth" argument:

> Failure to impose a sentence of death is a statement that his [Johnson's] life is worth more than the victim he annihilated – in fact, the two victims he annihilated.

Rec. Doc. 1273, p. 63.[39] Specifically, Johnson challenges the propriety of the government arguing that the jury could return a life sentence only if they believed the defendant's life was worth more than that of Deputy Zaffuto. Rec. Doc. 1337, p. 49.

The Court finds merit in the defendant's claim of error. Other Courts have found such victim-to-defendant comparisons reversible error when coupled with the implication that death is the only appropriate penalty, such as was argued here. In *Hall v. Catoe*, 601 S.E.2d 335 (S. C. 2004), the defendant had murdered two teenage sisters. In closing, the prosecutor argued:

> I am talking about values, because a jury verdict is a statement of values. And I am not talking about dollars and cents as far as what the [lives of the two girls were] worth, but nevertheless it is a question of values. What are the lives of these

---

[38]This observation has been repeatedly expressed by the New Jersey Supreme Court. *State v. Williams*, 550 A.2d 1172, 1201 (N.J. 1988)("A prosecutor's remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved. ... Absolute adherence to this duty is stringently compelled in capital cases where the penalty is death" [citations omitted]); *State v. Ramseur*, 524 A. 2d 188, 290 (N.J. 1987)( "Because death is a uniquely harsh sanction, this Court of necessity will more readily find prejudice resulting from prosecutorial misconduct in a capital case than in other criminal matters..." See also *State v. Koskovich,* 776 A.2d 144, 167 (N.J. 2001).

[39]The prosecution disagrees that its argument conveyed that a sentence of life would mean Johnson's life was worth more than Zaffuto's, but rather that their lives have equal worth. Rec. Doc. 1397, p. 26. The Court disagrees. The prosecutor clearly stated that unless a death sentence was imposed, the jury would be saying Johnson's life was "worth more" than that of his victim. Rec. Doc. 1273, p. 63.

two girls worth? Are they worth the life of this man, the psychopath, this killer who stabs and stabs and kills, and rapes and kidnaps[sic].

*Id.* at 339.   In that case, defense counsel failed to object at trial.  Nevertheless, the South Carolina Supreme Court vacated the death sentence and remanded for a  new sentencing hearing, finding ineffective assistance of counsel in the failure of counsel to object to this argument and further finding this failure prejudiced the outcome of the sentencing.

> In the present case, the solicitor not only suggested that Hall's life was worth less than his victims', he developed an arbitrary formula whereby if the jury finds Hall's life worth less than his victims', then the jury could reach no other conclusion than that the death penalty is justified.
>
> ***
>
> We hold that the solicitor impermissibly compared Hall's life to the victims' lives. We find that the solicitor's comparison (1) was so emotionally inflammatory that it became a material part of the jury's deliberation process; (2) unquestionably directed the jurors to conduct an arbitrary balancing of worth, which required that Hall be sentenced to death if the jury found Hall's life was worth less than the lives of his victims; (3) is totally unrelated to the circumstances of the crime; and (4) is distinguishable from traditional impact evidence in that it was not actually offered to show the impact of the crime on the victims or the victims' family.

*Id.* at 341.

In its opposition, the prosecution cites *Fields*, 483 F. 3d at 341 and  *Humphries*,  397 F.3d at 224.  However, the Court's reading of both cases indicates that the defense challenge was to a prosecutor's recitation of a chronological and comparative narrative of the life of the defendant and the victim during closing argument.   Significantly, the prosecution in those cases did not call upon the jury to impose the death penalty to affirm that the victim's life was worth more than that of the defendant.   In fact, in *Humphries*, the appellate court favorably distinguished the prosecution argument against Humphries from the prohibited argument in *Hall*.

> In our view, the *Hall* court gave a principled explanation of why the circumstances of *Hall* were distinguishable from those involved in our case. The *Hall* court indicated that *Hall* involved a direct "value" comparison between the

defendant and the victim, asking the jury to weigh the relative worth of the defendant and the victim. This comparison, the court concluded, rendered Hall's trial fundamentally unfair. By contrast, the court concluded that the solicitor in *Humphries* simply compared the "histories" of the defendant and the victim's lives "based on the evidence presented," *id.,* and thus, Humphries's trial was not fundamentally unfair.

*Humphries*, 397 F.3d at 223.

The Court finds that the prosecutor's call for the death penalty in order to affirm that the victim's life was worthier than that of the "evil" defendant was error, and an improper and inflammatory appeal to juror passion and emotion.[40]


b.  Comment on life in prison

Immediately following the rebuttal excerpt regarding the relative worth of the defendant and the victim, the prosecutor here continued with the next argument challenged by the defendant:

> He [defense counsel] essentially asks you to send him [Johnson] to his room where he gets privileges, three squares, and the ability to have visitors.  The only visitors that Sidney Zaffuto will have come to his grave site.

Rec. Doc. 1273,  p. 63.   Defendant Johnson characterized this as a "highly emotional pitch," and also complains that this was an improper reference to his exercise of his constitutional rights, citing *Hall v. Luebbers*, 341 F. 3d 706, 717 (8th Cir. 2003).  Rec. Doc. 1337, pp. 49-50.   In *Hall*, the prosecutor commented that the murder victim did not have a lawyer representing her, or a jury to decide her fate.   The appellate court in *Hall* acknowledged that remarks on a defendant exercising his constitutional rights could violate due process, but found no such prejudice in

---

[40]Again, the prosecutor's adoption of the widow's characterization of the defendant as "evil" enhanced the effectiveness of the prosecutor's argument as well as its resulting prejudice to the defendant's constitutional right to a fair trial.  In this regard, the Court notes that "name calling" and the use of "shorthand characterizations" of a defendant can be improper, especially when inflammatory or prejudicial.  See e.g., *United States v. Thompson*, 39 F.3d 320 (5th Cir. 1994); *Hall*, 419 F.2d at 587.

*Hall.* In this case, the prosecutor's comment regarding "privileges, three squares, and the ability to have visitors..." is more attenuated as far as being a reference to asserting constitutional rights.

Nonetheless, the Court does find that this argument was an inappropriate emotional appeal to impose the death penalty out of sympathy for the victim. The Court finds that the argued juxtaposition of Johnson receiving privileges, meals and visitors, against the deceased Sidney Zaffuto only receiving visitors at his grave is improper. All murders have, by definition, a victim who is dead and will forever remain dead. To argue that it would be unfair for the defendant to live while the victim is dead, "creates a *super-aggravator* applicable in every death case. No amount of mitigating evidence can counter this argument, and if the jury agrees they may not even consider mitigating evidence." *Le v. Mullin*, 311 F.3d 1002, 1015 (10th Cir. 2002)(citations omitted)(emphasis original).

In *Le*, a nearly identical appeal was made to the jury by the prosecution rebuttal.

> [Y]ou can sentence [the defendant] to life or life without parole.... He'll be well-cared for, well-fed. What about [the victim]?
> 
>    &ast; &ast; &ast;
> 
> Ladies and gentlemen, justice needs to be done in this case. Defense counsel asked you to sentence a punishment of life imprisonment or life without parole, but do you really think that justice would be done if this man goes to prison, gets three meals a day and a clean bed every night and regular visits from his family while [the victim] lays cold in his grave[?]

*Id.* at 1014-1015. In criticizing this language, the Tenth Circuit noted that "a hallmark of a fair and civilized justice system" is that "verdicts be based on reason, not emotion, revenge or even sympathy." *Id.* at 1015. It found that this argument was an improper emotional appeal to impose death out of sympathy for the victims, and also over-emphasized the inevitable permanency of the victim's death while possibly encouraging the jury to disregard mitigating circumstances. *Id.* at 1016.

In an earlier Tenth Circuit case, the prosecution struck a similar theme:

> [Would it be] justice [to] send this man down to prison, let him have clean sheets
> to sleep on every night, three good meals a day, visits by his friends and family,
> while [the victim] lies cold in his grave.  Is that justice?  Is that your concept of
> justice?  How do [the victim's children] go visit him?

*Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002).  The Tenth Circuit echoed the state court

finding that "these kinds of comments cannot be condoned."  *Id.*

    In *United States v. Johnson*, 495 F.3d 951 (8th Cir. 2007), the defense closing stressed the

length of a life sentence and the continual reminder to the defendant that she only had herself to

blame for her imprisonment.   In response, the prosecutor noted that ten, twenty, and thirty years

from now, the victims would still be dead.

> No matter how small [the defendant's] cell may be, it's going to be larger than the
> coffin that [the victims] are laying in now.

*Id.* at 979.   The Eighth Circuit held these "remarks strayed over the line."  *Id.*   "Although the

government was entitled to respond to Johnson's portrait of a miserable thirty years behind bars,

it should not have used the victims' plights to do so."  *Id.*   The Eighth Circuit cited to two Tenth

Circuit  cases in support, *Bland v. Sirmons*, 459 F.3d 999 (10th Cir. 2006) and *Le*, discussed

above.

    In *Bland,* the rebuttal argument included the following comment:

> Maybe the Defendant will be in prison, maybe he will be behind that concrete and
> those jail bars with his T.V. and his cable and good food. But one thing ... is for
> sure, [the victim]  won't be here and his family won't be able to be with him, they
> won't be able to share holidays with him.

*Id.* at 1027.  There, the Tenth Circuit was notably harsh in its criticism of the prosecution's

summation and its apparent repetitive nature.

> We regret to observe that in death-penalty case after death-penalty case,
> Oklahoma prosecutors have made speeches to the jury making light of the penalty
> of life imprisonment to demonstrate that the only proper punishment for a
> defendant's crime is death.
>                             \*\*\*
> As we have said many times, it is prosecutorial misconduct for the prosecution to
> compare the plight of the victim with the life of the defendant in prison. ...  "It is

of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," ... and comparisons such as those made here call into question the integrity of the criminal justice system.

*Id.* at 1027-1028 (citations omitted).

The Court finds that the prosecution's rebuttal comparison of the circumstances of life imprisonment with the permanency of the murder victim's death was clearly an improper appeal to the emotions of the jury and their sympathy for the victim and the victim's family in this matter. It also encouraged the jury to disregard the potent mitigation evidence that Johnson had presented through his own family members. See *Le*, 311 F.3d at 1016. As with other improper arguments discussed in this section, it was among the last words the jurors heard from counsel, and warrants a new penalty phase hearing.

c. Duty to sentence to death/justice to the victim/societal outrage

As indicated above, Defendant Johnson challenges "virtually every aspect" of the prosecution's final argument in the selection phase of trial. Rec. Doc. 1337, p. 49. In his original and supplemental memoranda, the defendant specifies a number of other passages of this argument that he claims were calculated to improperly inflame the emotions and prejudice of the jury. Rec. Docs. 1337, pp. 50-51, 1497, pp. 2-4. The Court finds some of these arguments were improper. The analysis below incorporates the excerpts specified by defendant Johnson in his memoranda as well as related excerpts found by the Court to contain similarly prohibitive comments that provide context and are independently improper.[41]

_____

[41]The Court is mindful of *United States v. Nguyen*, 507 F.3d 836 (5th Cir. 2007) which held that a district court may not grant a new trial on any basis other than one raised by the defendant's Rule 33 motion. In that case, the defendant moved for a new trial based on newly discovered evidence. The court granted a new trial based on the government's improper rebuttal, a complaint not raised by that defendant's motion. Nguyen, however, is distinguishable because here the defendant has alleged that "virtually every aspect" of the prosecution rebuttal was

<u>i.  Duty to sentence to death</u>

Throughout its rebuttal argument in the final selection phase, the prosecution argued that the death penalty was the only appropriate penalty;  that not imposing it would be a "failure of will"  and  "capitulation" by the jury and would amount to the jurors "being the water that washes the blood from (Johnson's)  hands."   Rec. Doc. 1497, p. 3.

Early into his rebuttal argument, the prosecutor stated:

> Today, ladies and gentleman, today is the day for justice, and justice must be done.   It is a day for justice for the victims.   It is the day for justice for the people of this parish and surrounding parishes.  It is a day of justice for John Johnson.   *Today, today, justice demands a sentence of death.*

Rec. Doc. 1273,  p. 54 (emphasis added).  Later in the rebuttal, the prosecutor discussed the defendant's family members who testified about his positive qualities.   He noted that they were, in a sense, victims also but that:

> any anguish that may occur to his family as a result of a sentence of death is the result of his own actions  *It's not the result of you doing the right thing in this case.* It is up to him. It is up to him to make peace with his family. It is not your job to do that for him. Make him, make him take responsibility for his choices. Make him explain this to his family. *Don't feel guilty about doing your duty in a death penalty case.*   We are here because of the choices the defendant made.

*Id.* at pp. 59-60 (emphasis added).

> Remember, life without parole is the least sentence. It is the least sentence available. And nothing he has done and nothing that you have seen makes that the appropriate resolution of this case.
>
> *Don't be the water that washes the blood from his hands. For every drop of blood that spilled on the floor of the Iberia Bank, sentence him to death. For every bullet that tore into the bodies of the victims, sentence him to death. And for every gurgle and every gasp of Joe Gennaro on that tile floor on May the 3rd, sentence*

designed to inflame the jurors' emotions and passions, as previously indicated.   Rec. Doc. 1337, p. 49.  This Court has cited additional excerpts from the rebuttal to be improper on the same basis.  Noteworthy also is that *Nguyen* was a noncapital case.

> *him to death.*
>
> *Do not confuse mercy with weakness. You have an obligation to uphold the law,*
> *and it takes courage to do that. The Government is confident, absolutely*
> *confident, that you have that courage.*

*Id.* at pp. 64-65 (emphasis added).

The prosecutor then argued that "[m]ercy ceases to be a concept worthy of a civilized

nation where it is not reserved for those truly unfortunate cases."    *Id.* at p. 65.   He then cited as

appropriate examples, a mother who steals to feed her children, a son who robs to pay for his

mother's kidney dialysis, or a parent who kills a person who has abused his child.   After

declaring the defendant unworthy of any mercy, the prosecutor continued with the following

argument specified by the defendant:

> *When a career criminal kills a police officer, he deserves the death penalty. When*
> *a convict kills a second time, commits a second felony murder, it always deserves*
> *the death penalty, without exception. You don't get to commit two murders.*
> *Enough is enough.*
>
> *You must not capitulate. You must be vigilant. Anything less than a sentence of*
> *death in this case is a failure of will and a wholly inadequate response to the*
> *senseless murder of a man who dedicated his life to protecting us. Don't have a*
> *tepid or timid response. Respond in kind and make sure your response is certain.*
> *Express your outrage and our outrage and our unyielding commitment to protect*
> *those who protect us.*

*Id.* at p. 67(emphasis added); Rec. Doc. 1497, pp. 3-4.

After briefly discussing the many good qualities of Sidney Zaffuto and Joe Gennaro and

the families they left behind, the prosecutor then finished with the following:

> People who do evil, people who are evil, deserve justice.  Make no mistake.
> John Johnson is evil.   *Justice, justice can only be had in this case if the death*
> *penalty is imposed.*
>
> As you sit there, you are not simply 12 people. You are the conscience of the
> community. You represent the United States. *In this case, you are the dispensers*
> *of justice.*
>
> *Shirley Zaffuto, Linda Kelly, Terry Zaffuto, Andrew Medina, they all wait for you*
> *to give them some justice. The citizens of this parish and surrounding parishes*

*look to you for justice. Justice can only be had, only be had, by imposing a sentence of death.*

The death penalty was enacted for situations like the one that confronts you today. Make no mistake about it. And if it must -- and it must be, it must be imposed in this case because if not him, who? If not when -- if not now, when? Because if killing a police officer after executing a restaurant owner is not enough, what is?

*I'm going to tell you something, ladies and gentlemen, your head, your heart, and your gut is going to tell you what the right thing is in this case. The right thing is to punish him by imposing a sentence of death. Do the right thing, impose that sentence, not simply because he deserves it, impose it because he has earned it.*

*Id*. at pp. 68-69 (emphasis added); Rec. Doc. 1337, p. 51.

Numerous courts, both federal and state, have held that arguments suggesting that a jury has a duty to decide a case a certain way, and/or that it would be weak or cowardly to fail to do so, is an improper attempt to stir passions and, in effect, intimidate the jurors into returning a particular verdict. In *Young*, the defendant was charged with various frauds. In the rebuttal argument, the prosecutor stated, in part, "If you feel you should acquit him for that it's your pleasure. I don't think you're doing your job as jurors in finding facts as opposed to the law..." *Id.,* 470 U.S. at 5-6. The United States Supreme Court found that "the prosecutor was also in error to try to exhort the jury to 'do its job'; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice." *Id.* at 18. The Supreme Court cited to the ABA Standards for Criminal Justice, 3-5.8( c) and 4-7.8( c), which provide that lawyers, including prosecutors, should not use arguments calculated to inflame the passions or prejudices of the jury. The concurring opinion was even stronger in tone, finding that the comment "so clearly violating the disciplinary rules of our profession," that it "deserve[s] stern and unqualified judicial condemnation." *Id.* at 28. It went on to note that "[m]any courts historically have viewed such warnings about not 'doing your job' as among the most egregious forms of prosecutorial misconduct." *Id.* at 30.

Other courts have also criticized similar comments. In *United States. v. Mandelbaum,*

803 F.2d 42 (1st Cir. 1986), the First Circuit found the prosecutor's exhortation to the jury to

"[d]o your duty and return a verdict of guilty" was improper.

> Cases are to be decided by a dispassionate review of the evidence admitted in
> court. There should be no suggestion that a jury has a duty to decide one way or
> the other; such an appeal is designed to stir passion and can only distract a jury
> from its actual duty: impartiality.

*Id*. at 44.

In *State v. Roussan,* 961 S.W.2d 831 (Mo. 1998), an en banc capital case, the defense

lawyer had urged mercy in the sentencing phase argument.   The prosecutor responded in

rebuttal by arguing that the defendant did not deserve mercy under the facts of the case.  He then

concluded, "The defense has asked you for mercy and what they are hoping for is weakness....

Weakness is something we can no longer afford.  Do your duty."   *Id.* at 851.  The Missouri

Supreme Court chastised the prosecution, saying that "[p]rosecutors should avoid...any

suggestion that the jury is weak if it fails to return a certain verdict."   *Id.*

In *State v. Rose*, 548 A. 2d 1058 (N.J. 1988), the prosecutor argued in part as follows:

> You know in your minds and in your hearts that what you're going to do is the
> right thing. It's something you really have no choice. It's not anything that's going
> to be difficult to live with. It's going to be voting against your conscience, voting
> against the evidence, voting against the law, that's what you have to do if you give
> him the break you wouldn't give anybody else.

> The law cries out for a verdict here, ladies and gentlemen. I don't cry for it. We
> the citizens that follow the law, cry out for it. We demand it. The law is in place;
> have the guts and the heart and the mind to follow it so that we can keep our
> foundation of justice in this country and this State otherwise we're in a whole lot
> of trouble, deep trouble unless you can show us you have the guts to do what has
> to be done.

*Id.* at 1094.   In finding the argument improper, the New Jersey Supreme Court held:

> Such statements were inaccurate and misleading to the jury. As the prosecutor
> was undoubtedly well aware, the capital punishment statute does not mandate the
> death penalty for capital murder, leaving the determination of the appropriate
> penalty to the jury based on its weighing of aggravating and mitigating factors.
> The prosecutor's suggestion that the death penalty was required by law was highly
> inappropriate.

*Id.*[42]

Under the FDPA, capital punishment is never mandatory, regardless of the circumstances and there is no duty to impose the death penalty.   The Court finds that the prosecutor rebuttal charging the jury with capitulation, a failure of will and washing the blood from the defendant's hands if they returned a verdict other than death was a highly improper emotional appeal to stir the jurors passions and distract them from their actual duty, which was to decide the case impartially.   *Mandelbaum*, 803 F.2d at 44.   Again, the defendant is granted a new penalty phase hearing.

### ii.   Justice to the victim and society

The prosecutor in rebuttal exhorted the jury in several passages to specifically do justice to the victim, his family, and the surrounding community by sentencing defendant Johnson to death.

> Today, ladies and gentleman, today is the day for justice, and justice must be done.   It is a day for justice for the victims.   It is the day for justice for the people of this parish and surrounding parishes.   It is a day of justice for John

---

[42]See also *Drake v. Commonwealth*, 91 S.W.2d 1009, 1014 (Ky.App. 1936) ("...challeng[ing]the  jury to return a death verdict or else be regarded as weak-kneed and lacking in courage, regardless of what their views under the evidence might be...was improper.");  *State v. Pennington*, 575 A.2d 816, 831 (N.J. 1990)(prosecutor may not tell the jurors that they are obligated by their oath to return a particular verdict... "It is tantamount, as defendant contends, to a deliberate attempt to intimidate the jury into returning verdicts of capital murder and of death.");  *State v. Purnell,*  601 A.2d 175, 188 (N.J. 1992)(the prosecutor should not have appealed to jurors to "have the courage" to vote for death);  *Evans v. State*, 28 P.d 3d 498, 515 (Nev. 2001)(in rebuttal closing, the prosecutor asked, "do you as a jury have the resolve, the determination, the courage, the intestinal fortitude, the sense of commitment to do your legal duty?" Asking the jury if it had the "intestinal fortitude" to do its "legal duty" was highly improper....(as) particularly designed to stir the jury's passion and appeal to partiality); see also *Jones v. State*, 610 P.2d 818, 820 (Okl.Cr. 1980); *Cooper v. State*, 584 P.2d 234, 238-239 (Okl. Cr. 1978); *but see also, Com. v.  Hughes*, 865 A.2d 761, 806 (Pa. 2004)(exhorting the jury to not "back out" or "cop out" with a life sentence, that the jury should "stand up loud and clear" in returning a death sentence not improper).

Johnson.   Today, today, justice demands a sentence of death.

Rec. Doc. 1273, p. 54.

The defendant specifically challenges the prosecutor's subsequent statement that imposition of the death penalty "is meant to show society's outrage, absolute outrage regarding the most heinous of crimes" at which point defense counsel objected that it is not proper to argue "what we're doing for society" but rather the penalty has to be based on the facts of the case. The objection was overruled.  Rec. Doc. 1273, pp. 62-63.

The defendant also specifically challenges the prosecutor's return to the theme of justice:

> Know this: a death penalty trial is a prayer.  It is a prayer for justice.  It is the last opportunity for society to vindicate the victim, the last opportunity for citizens to make a statement.

*Id.* at p.  66; Rec. Docs. 1337, p. 51, 1497, p. 3.  Defense counsel again objected, stating that a trial "is not a prayer" nor a "last opportunity for society to do anything."   Rec. Doc. 1273, p. 66. Again, that final objection was not sustained by the Court.   *Id.*

The prosecutor then urged the jury to "[e]xpress your outrage and our outrage and our unyielding commitment to protect those who protect us."   *Id.* at p. 67; Rec. Docs. 1337, p. 50, 1497, p. 4.

Then near the end of these proceedings, the prosecutor argued:

> As you sit there, you are not simply 12 people. You are the conscience of the community. You represent the United States. In this case, you are the dispensers of justice.

> Shirley Zaffuto, Linda Kelly, Terry Zaffuto, Andrew Medina, they all wait for you to give them some justice. The citizens of this parish and surrounding parishes look to you for justice. Justice can only be had, only be had, by imposing a sentence of death.

*Id.* at p.  68; Rec. Doc. 1337, p. 51.

The defendant claims the above comments were not proper rebuttal and were calculated to inflame the passions and prejudices of the jury.   The government contends its argument was

proper as urging the jury to impose death as the just punishment considering the defendant's character and the crime, as well as the impact upon the victim and his family.

The Supreme Court has recognized that in a death penalty case, "a jury that must choose between life imprisonment and capital punishment can do little more - and must do nothing less - than express the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois*, 391 U.S. 510, 519-520 (1968). The Court finds that the prosecutor's final rebuttal, with respect to most of the above passages, were within the proper scope of permissible argument. The jury does in effect act as the conscience of the community in deciding the penalty in a capital case. This aspect of the rebuttal focused on retribution, the prosecutor arguing that due to the nature of the crime, including the victim being a police officer, and the defendant's past criminal history, the just punishment was death.

### d. Summary

The improprieties in the prosecutor's rebuttal are the ones previously discussed. The exhortations that justice "demands" the death penalty and that the Zaffuto family "all wait for you to give them some justice" were improper. Rec. Doc. 1273, p. 68. The Court further finds that this was an undue appeal to sympathy for the victim's family and their presumed expectations.

In summary, the Court finds three separate and independent improper appeals to passion and prejudice in the government rebuttal: (1) the emotionally inflammatory directive to the jury that a verdict of life imprisonment would mean they valued the life of the defendant above that of the victim; (2) the emotionally inflammatory appeal to sympathy for the victim and the victim's family by comparing the life of the defendant in prison to the permanency of the victim's death; and (3) the emotionally intimidating pressure imposed upon the jury to bring in a

verdict of death on behalf of the Zaffuto family or else be perceived as capitulating, lacking in will, and "washing the blood" from the defendant's hands.

The Court also emphasizes that reading the transcript of the rebuttal alone does not convey the emotional impact this argument had upon the jury. This particular prosecutor has extensive capital experience and is very talented and capable. He also has a very powerful voice and a commanding presence with a demeanor of extreme self-confidence. During his summation, the Court observed the jurors and they were, literally, riveted in their seats by his oration, utterly attentive and motionless. Until the widow took the stand, he was successfully carrying the "double burden" imposed on a government prosecutor. At that point in the selection phase, and throughout the final rebuttal argument, he repeatedly crossed the line marking the defendant's right to a constitutionally fair trial.

> Added to this is the unseen presence in the courtroom of our great and powerful government with its counsel and its voice in the person of the United States Attorney. For all these reasons his power to persuade is great. And for these reasons he must speak with the care, the decorum and the sensitivity that befit his position and his duties. Neither the heat and strain of trial nor the right to strike hard blows authorizes him to do otherwise.

*Hall*, 419 F.2d at 588.

> A capital sentencing jury is made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die, and they are asked to decide that issue on behalf of the community. Moreover, they are given only partial guidance as to how their judgment should be exercised, leaving them with substantial discretion.

*Caldwell*, 472 U.S. at 332-333.

Unfortunately, the prosecutor's zealousness overrode his otherwise good judgment, and his commanding presence likewise overwhelmed the capacity of the jury to decide the penalty dispassionately. A new penalty phase is justified.

e.  Interest of Justice/Plain Error

The prosecution correctly points out that defense counsel failed to object at trial to some of the rebuttal argument above that the Court has found to have been improper.   To the extent that it provides guidance, the plain error rule should be considered and a new trial denied if the substantial rights of the defendant were not affected.   *Scroggins*, 379 F.3d at 256.  In this regard, the Court finds that the substantial rights of the defendant were in fact affected by the rebuttal argument, and that the plain error standard has been met.

In addition, the FDPA requires a court of appeals to vacate a death sentence if it concludes that the sentence was imposed "under the influence of passion, prejudice or any other arbitrary factor."  18 U.S.C. §3595(c)(2).   The Fifth Circuit has determined that in order to make this finding, the circumstances must show that the passion, prejudice or other arbitrary factor "most likely" influenced the sentence.   *Agofsky*, 458 F.3d at 373 (5th Cir. 2006)(citing *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000))[43].   For purposes of this Rule 33 analysis, this Court finds that the repeated and inappropriate emotional appeals in the rebuttal argument "most likely" influenced the sentence.   In fact, it finds that the improper argument did so beyond a reasonable doubt and right in front of its eyes.

In *Caldwell*, the Supreme Court dealt with a prosecutorial closing in a capital sentencing hearing that told the jury their decision was subject to appellate review.   In so doing, it repeated its mantra that the "qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."  *Id.* 472 U.S.

_____

[43]The government argues that in order for its closing argument to result in a new sentencing hearing, the comments must have not only been  undesirable or even universally condemned, but must have also so infected the proceedings with unfairness that the result is a denial of due process.  Rec. Doc. 1397.  The government, however, is citing the standard for *federal habeas corpus* review of *state* prosecutions, a much more deferential standard of review.  See  *Donnelly v. DeChristoforo*, 416 U.S. 637, 632-643 (1974);  *Cobb v. Wainwright*, 609 F.2d 754, 755 (5th Cir. 1980).  Nevertheless, the Court concludes that this standard was met as well.

at 323 (citation omitted).   The Supreme Court found the prosecutor's remarks  violated the Eighth Amendment's heightened "need for reliability in the determination that death is the appropriate punishment in a specific case."   *Id.*

In this regard, the Court finds that the facts of the offense, while clearly fulfilling the statutory criteria for a capital case, do not approach the category of heinousness presented in the capital cases upon which the government relies.   The slaying of Deputy Zaffuto was tragic and reprehensible.   Nevertheless, it occurred in the chaotic circumstance of an aborted robbery in which the defendant himself was shot.   The defendants' intent was to rob a bank, not to commit murder.   Johnson is certainly legally responsible for what occurred, but this slaying lacks the horrific circumstances of many other capital cases that involve substantial premeditation to murder, as well as torture or other significantly callous and deliberative conduct.   In addition, as already noted, Johnson presented substantial positive mitigation regarding his relationship with multiple family members over a period of many years.   To the extent that the evidence relevant to the propriety of the death sentence is weighed against the effect of the improper prosecutorial argument on a motion under Rule 33, the Court finds that these errors prejudicially affected substantial rights of  this defendant during the selection phase sufficient to warrant a new hearing in the interest of justice, and that this seriously affected the fairness, integrity and public reputation of the proceedings.

Under the circumstances of this case, the Court is convinced that the overall effect of  the government rebuttal at the end of the critical selection phase, included the improper arguments cited above, was both physically and emotionally overwhelming, with the expected result that the jury could not avoid being impacted in their deliberations.   The interest of justice requires a new trial as to the selection phase.

<u>Claim X:   The Introduction Of The Unproven 1974 Unadjudicated Murder Introduced Arbitrary</u>
<u>Circumstances Into The Case</u>

Defendant Johnson claims that the evidence of the unadjudicated murder of Joseph Gennaro in 1974 introduced arbitrary circumstances into the case, in light of the jury verdict finding that the murder was not proven, unanimously and beyond a reasonable doubt.   Rec. Docs. 1238-1, 1238-2.   As indicated previously, one of the non-statutory aggravating factors charged by the prosecution in the penalty phase was that defendant Johnson had a "substantial criminal history."   The evidence of that consisted of a simple burglary conviction in 1974,  an illegal carrying of a firearm by a convicted felon conviction in 1977, a bank robbery conviction in 1983, plus two criminal charges of which he had not been tried or convicted.  One was an attempted bank robbery in 2003, which the jury found proven[44], and the other the first degree murder of Joseph Gennaro in 1974.

The allegation that defendant Johnson murdered  restaurant owner, Joseph Gennaro, during a botched robbery in 1974 was a hotly contested issue throughout the pretrial proceedings in this case.[45]   It was also the dominating piece of the government's penalty phase presentation.

---

[44]The accuracy of this unadjudicated crime was essentially uncontested by the defense.

[45] The defense vehemently and repeatedly objected pre-trial to any evidence being admitted regarding this alleged offense.  See, for example, Rec. Doc. 1049.  In March, 2008, shortly before a previous trial setting, co-defendant and cooperating government witness, Herbert Jones, who had implicated Johnson in the 1974 slaying, became incapacitated and could not testify.  The government proposed introducing his statements  through the FBI agent who debriefed him.  The Court ruled the evidence inadmissible under those circumstances since it would constitute double hearsay and Johnson would be unable to properly cross examine the evidence for bias and unreliability.  Rec. Doc. 790.  Another effort by the prosecution to introduce similar evidence through double hearsay as well was likewise rejected by the Court.  Rec. Doc. 793.  Those rulings were appealed by the government under 18 U.S.C. § 3731, which requires the certification of the United States attorney "that the evidence is a substantial proof of a fact material in the proceedings."  Rec. Docs. 806, 809.  As a result, the trial date was cancelled.  That appeal was subsequently dismissed by the government in July 2008.  Rec. Doc. 922.  This narrative is provided simply to underscore the significance of this allegation to the government's case.

Of the approximate two days of prosecution penalty phase evidence, over a day of it focused on the 1974 slaying.

This murder charge was extremely significant because it was the only evidence that Johnson had been actually violent in the past. The rest of his criminal history certainly indicated potential violence, but in each instance, no violence actually occurred. No shots were fired during the bank robbery in the 1983 nor in the aborted bank robbery in 2003[46]. Without the 1974 allegation, the defense could have more credibly argued that the only reason Johnson used his weapon in the current offense was because he himself was already being fired upon, and hit, by Officer Jenkins.

The jury was instructed that defendant Johnson had not ever been tried for, much less convicted of, the alleged first degree murder in 1974. They were also instructed that "before you can even consider these allegations, you must determine whether his guilt...has in fact been proven unanimously and beyond a reasonable doubt." Rec. Doc. 1273, pp. 75-76. They were also instructed that the government had the burden of proving the allegations unanimously and beyond a reasonable doubt, and "if it fails to do so, you must disregard the allegation entirely." *Id.* at p. 76.

In conjunction with the instructions, the Court reviewed the verdict forms with the jury. The Court reiterated that before the jury could even consider the unadjudicated conduct as part of his alleged substantial criminal history, "you have to decide whether you have been unanimously persuaded beyond a reasonable doubt that he is in fact guilty..." *Id.* at p. 88. In each of the two verdict forms pertaining to the selection phase, the jury checked "no" to the question of whether they unanimously found beyond a reasonable doubt that Johnson was guilty

---

[46]With regard to the 2003 aborted robbery, the defense elicited evidence that no shots were fired and the defendants, including Johnson, fled when the robbery was unexpectedly interrupted, rather than resorting to violence. Rec. Doc. 1272, pp. 165-166.

of the 1974 murder.  Rec. Docs. 1238-1, 1238-2.

Defendant Johnson claims now that the evidence of the 1974 murder introduced during the selection phase tainted the penalty phase ultimate findings.  He points out that it was a centerpiece of the government's penalty phase argument, which emphasized that "(w)hen a convict kills a second time, commits a second felony murder, it always deserves the death penalty, without exception."  Rec. Docs. 1337, p. 53, 1273, p. 67.  Defendant Johnson also points out that the jury verdict form only asked for whether the verdict was unanimous.  It did not ask how many individual jurors, if any, found the murder proven beyond a reasonable doubt.  Yet, by virtue of not reaching a unanimous consensus, the evidence of the 1974 murder should have become completely irrelevant to all the jurors,  with no probative value whatsoever as to the penalty.

The government responds by relying on the assumption that the jury disregarded the murder allegation entirely, as they were instructed to do, in the event they could not reach unanimity.  The issue presented is whether it is realistic to believe that all the jurors did in fact disregard this evidence entirely, including those who may have been convinced beyond a reasonable doubt that it was true.

The parties agree that, generally speaking, a curative instruction to disregard is sufficient to erase any taint of what amounts to inadmissible evidence.   However, if the evidence is "highly prejudicial and otherwise irrelevant to the case," it is not cured by a court admonition to disregard.  *Odom v.* United *States*, 377 F.2d 853, 859 (5th Cir. 1967); see also *Flores v. United States*, 379 F.2d 905, 910 (5th Cir. 1967); *Dunn v. United States*, 307 F.2d 883 (5th Cir. 1962).

In the seminal case of *Bruton v. United States*, 391 U.S. 123 (1968), the United States Supreme Court held that admitting a confession by a co-defendant, which also implicated the defendant in their joint trial, was prejudicial error as to the defendant, regardless of the giving of

any instruction by the trial judge that the evidence could only be considered against the co-defendant.

> It is not unreasonable to conclude that in many...cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless...there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.

*Id.* at 135.[47]

The Supreme Court also acknowledged "the impossibility of determining whether in fact the jury did or did not ignore" the incriminating evidence. *Id.* at 136. Nevertheless, the Court held that it was enough if the evidence "posed a substantial threat" to the defendant's constitutional rights at issue, and concluded that the "effect is the same as if there had been no instruction at all." *Id.*

In *United States v. Roark*, 924 F.2d 1426 (8th Cir. 1991), substantial evidence prejudicial to the defendant was admitted and ultimately determined by the trial judge to have been inadmissible. The judge then instructed the jury to disregard it. The stricken evidence included the entire testimony of a DEA Special Agent and an undercover informant for the government. The Eighth Circuit reversed, finding an instruction inadequate to remove the prejudice caused by the admission of the evidence. The appellate court noted that "one statement, damaging but isolated, is easily remedied through a limiting instruction," but that in this case the inadmissible evidence was the theme of the trial. *Id.* at 1433.

The Court finds that the 1974 murder was the critical dispute in the penalty phase evidence regarding defendant Johnson's criminal history and figured prominently in the government's closing selection phase argument as justification for the death penalty. The Court

---

[47]Justice Jackson, in *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716 (1949) stated his view far more bluntly: "The naive assumption that prejudicial effects can be overcome by instructions to the jury...all practicing lawyers know to be unmitigated fiction."

also recognizes the Catch-22 the situation presents here and in all capital cases where unadjudicated criminal conduct is alleged.  Had the jury unanimously found the government to have proven the defendant guilty of the 1974 murder beyond a reasonable doubt, that evidence would have been extremely relevant and supportive of imposing the death penalty.   But the jury did not.   Therefore the evidence became completely irrelevant and  probative of nothing.   Its volatility remained, however, and could be capitalized in argument, which preceded the jury finding.   Yet, an instruction to disregard is least effective, and a mistrial most compelling, "when the evidence is admitted, indicates on its face that defendant has been guilty of a prior crime, and the evidence plays a prominent part in the conduct of the trial."   *United States v. Taylor*, 605 F.2d 1177, 1179 (10th Cir. 1979).

Defendant Johnson was, of course, sentenced to death, so the consequences could not have been more severe.   Considering the circumstances, including the dominant role the 1974 murder played in the penalty phase, the Court believes "the risk that the jury [did]  not, or [could] not, follow instructions [was] so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton*, 391 U.S. at 135.

In addition to the issues already found to have merit, this separately and independently justifies a new penalty phase hearing in the interest of justice under the most stringent standard. The Court recognizes that the FDPA allows for consideration of unadjudicated conduct during the selection phase.  This Court acknowledges the dilemma created when the government proof fails to convince all the jurors, making the evidence utterly irrelevant,  but nonetheless may have convinced some, who cannot realistically be expected to disregard it.  That is a risk in using unadjudicated conduct.  But with that failure, the concern is the underlying unfair prejudice to the defendant.

**CATEGORY V: CUMULATIVE IMPACT OF ERRORS/Claim XVII**

Claim XVII: The Cumulative Impact Of These Errors Warrants Setting Aside The Death
Sentence In This Case In The Interest Of Justice

Finally, the Court unhesitantly finds that the interest of justice requires a new trial on the selection phase based on the cumulative effect of the trial errors itemized herein. The cumulative error doctrine recognizes the aggregation of individual non-reversible errors, both plain and harmless, can lead to the defendant's denial of the constitutional right to a fair trial. *United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978). *Williams,* 264 F.3d at 572 (5th Cir. 2001), citing to *United States v. Sepulvada*, 15 F,3d 1161, 1195-1196 (1st Cir. 1993). See also *Munoz*, 150 F.3d at 418. "In other words, a column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts." *Sepulvada*, 15 F.3d at 1196. All plain errors preserved for appeal and all plain errors are reviewed. *Munoz*, 150 F.3d at 418. Appellate reversal based on cumulative effect of errors is a "rarity." *United States v. Villarreal*, 324 F.3d 324, 328 (5th Cir. 2003).

The Fifth Circuit has recently reminded that this claim is *sui generis* and the number and gravity of the errors is evaluated in the context of the entire case. *United States v. Valencia*, 600 F.3d 389, 429 (5th Cir. 2010), citing *Sepulvada*, 15 F.3d at 1196, which, in turn, advised that from an appellate perspective:

> A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any and combined effect; how the district court dealt with the errors as they arose (including the efficacy - or lack of efficacy - of any remedial efforts); and the strength of the government's case. ... The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*Sepulvada*, 15 F.3d at 1196.

Here, the Court has found that the Category III  presence of the uniformed police officers in the courtroom and the conflation of mitigating factors by the Court constituted error insufficient to warrant a new trial in themselves.   Each of the Category IV claims, the government's nondisclosure and use of inadmissible prejudicial victim impact evidence, the admission of evidence concerning the 1974 attempted robbery and murder**,** and the government's impermissible argument during the selection phase, each constitute error sufficient to deprive the plaintiff of his right to a fair trial for purposes of this motion for new trial.   One of  the errors with regard to Category III claims and <u>all</u> of the errors with regard to Category IV claims occurred over the last two and one-half days of the penalty selection phase.[48]    In the alternative to its findings as to Category IV errors, the Court finds that the combination of any Category IV error with any other error overwhelmingly served to deprive the defendant of a fair trial and constituted a miscarriage of justice for all the reasons provided hereinabove, so as to warrant a new sentencing selection hearing in the interest of justice.


## CONCLUSION: The Interest Of Justice Under Rule 33

In holding that the interest of justice requires a new selection hearing, the Court makes no determination as to the propriety of any sentence or whether the evidence would or would not support a death sentence.  It finds that the interest of justice requires a new sentencing selection hearing for this capital defendant.

---

[48]The record will reflect that jury selection took approximately four days, the guilt phase to verdict lasted approximately three days, the eligibility phase to verdict lasted less than half of a trial day, and the penalty selection phase lasted approximately four trial days to deliberations. The jury deliberated approximately one and one-half hours before returning its verdict.   Rec. Docs. 1196-1199, 1212, 1214, 1219, 1221, 1225-1226, 1235, 1238.

The Court is mindful that the expenditure of taxpayer and government resources to this date in this matter have been substantial. All involved have been aware of the gravity of the stakes in this matter at every step in the process.  That appreciation alone, however, failed justice during the selection phase of trial.

Accordingly,

IT IS ORDERED that the motion for new trial filed by John Johnson is DENIED as to the guilt-phase and eligibility phase verdicts and GRANTED as to the selection phase verdicts. (Rec. Doc. 1337).

IT IS FURTHER ORDERED that the supplemental motion for new trial filed by the defendant, John Johnson is DENIED.  (Rec. Doc. 1448).

New Orleans, Louisiana, this 18th  day of May, 2010.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE